In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3595

MARION COUNTY CORONER'S OFFICE,

*Petitioner,*

*v.*

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Respondent,*

and

JOHN LINEHAN,

*Intervening Respondent.*

Petition for Review of an Order of the
Equal Employment Opportunity Commission.
No. 1120080001

ARGUED JUNE 3, 2010—DECIDED JULY 27, 2010

Before MANION, EVANS, and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge.* The chief deputy coroner of Marion County, Indiana, John Linehan, a white male, was stripped of certain duties and ultimately fired by the coroner, Dr. Kenneth Ackles, an African-American male.

After hearing testimony from fourteen witnesses, an Equal Employment Opportunity Commission (EEOC) administrative law judge (ALJ) found that the coroner's office took action against Linehan based on his race and in retaliation for an internal complaint that Linehan filed against Ackles. Linehan was awarded front and back pay, attorney's fees, and $200,000 in compensatory damages. The EEOC affirmed in all material respects. The coroner's office now petitions for review, arguing that the findings of discrimination and retaliation were erroneous and that, even if they were not, the compensatory damages award was excessive under the circumstances.

The Marion County coroner is an elected, part-time position.[1] By contrast, the chief deputy coroner, who reports directly to the coroner, is a non-elected position charged with the day-to-day management of the coroner's office. Among other things, the chief deputy coroner is responsible for supervising and disciplining employees and preparing the office's budget. He also works with the coroner on hiring and firing decisions.

---

[1] Marion County is located in central Indiana and includes the city of Indianapolis. According to its website, the coroner's office "serves all those who die in Marion County, their families and other associated agencies in the investigation of unusual and unexplained deaths, resulting in timely and accurate completion of the Coroner's Verdict and death certificates." Marion County Coroner's Office, http://www.indy.gov/eGov/County/Coroner/Roles/Pages/strat-plan.aspx (last visited June 14, 2010).

In November 2004, Ackles, a chiropractor by trade, was elected coroner. At that time, Linehan and Alfarena Ballew, an African-American deputy coroner, both sought the position of chief deputy coroner. Ackles chose Linehan for the job because he was currently serving as the interim chief deputy, and Ackles wanted to maintain continuity in the office. Ackles and Linehan were sworn in as coroner and chief deputy coroner, respectively, in January 2005.

Soon after, Ackles met with Linehan to discuss his (Ackles') agenda. During their conversation, Ackles said that he "really needed to find a way to get more African-Americans into the Coroner's Office," especially as deputies. Ackles asked Linehan to determine how to execute this plan. Linehan contacted the city's legal office and learned that deputy coroners could not be removed without cause. Nevertheless, a city/county council member who had been on Ackles' campaign committee regularly sent Linehan resumes and encouraged him to hire more African-American staff.

In February 2005, Ackles was informed about a salary increase for Linehan's position. Ackles later testified that he had not been told about the raise previously. Linehan testified, however, that Ackles had reviewed the budget and approved of the raise, which Linehan had proposed while serving as the interim chief deputy coroner.

In March 2005, Linehan recommended the termination of a white deputy coroner, Bill Morris. Morris had been disciplined by the previous chief deputy coroner and recently suspended for failing to properly handle

and preserve key evidence from a crime scene in a case involving the FBI. Ackles agreed with the recommendation at the time but later testified that he could not clearly recall the specific incident prompting Morris' firing. When asked whether such conduct could warrant termination, however, Ackles agreed that it could.

In June or July 2005, Linehan recommended disciplining Ballew for multiple performance issues. On one occasion, it took Ballew over an hour to arrive at the scene of a homicide, although office policy required that she respond within thirty minutes. During her absence, the victim was left lying in the street, with her friends and family watching. On another occasion, Ballew took more than two hours to arrive at a hospital where a child was dying. The family wanted to donate the child's organs, but because Ballew arrived late, the organs were no longer usable. On that occasion, Linehan offered to send another deputy, but Ballew assured him that she would be "right there." Despite these incidents, Ackles told Linehan not to discipline Ballew.

Ballew's problems continued the next month when, despite arriving thirty minutes late for a mandatory staff meeting, she prepared a time sheet indicating that she had arrived on time. Linehan wanted to discipline Ballew, but Ackles once again stopped him from filing a written report. When Ballew continued to arrive late to meetings and crime scenes, however, Linehan prepared a written reprimand with the assistance of the human resources office (and without Ackles' knowledge). Linehan later testified that he normally did not submit pro-

posed disciplinary actions to the coroner for approval. He did so initially in Ballew's case, however, to avoid the appearance of bias, as she had applied for the position of chief deputy coroner.

Shortly thereafter, an anonymous letter was sent to members of the city/county council accusing Linehan of "double dipping" or "ghost employment"—that is, billing the coroner's office for time spent working elsewhere. Indeed, Linehan was working as a paramedic on his days off. But outside employment was permitted, and Linehan had previously disclosed this information. In response to Ackles' questions about the letter, Linehan gave him written documentation demonstrating the validity of his hours. Ballew later admitted to authoring the anonymous letter.

Around the same time, Linehan discovered that $3,000 was missing from a property locker. When he contacted the city's legal office, Linehan was told to immediately file a police report. Although Ackles told him not to file the report, Linehan eventually did so at the urging of the legal office. Additional property was also found missing, but everything eventually turned up in a janitor's[2] closet. Ackles directed Linehan not to take any disciplinary action against the janitor and forbade Linehan from contacting the police again. Nevertheless, Ackles later

---

[2] The record is conflicting regarding the janitor's race. The ALJ said that he was African-American; the EEOC said that his race was unknown; and the coroner's office's discovery responses said that he was white.

testified that, under those circumstances, disciplining the janitor was proper.

In early November 2005, Ballew failed to attend another mandatory meeting. When Linehan confronted her, Ballew yelled at him, called him a liar, threatened him, and accused him of mistreating African-American staff. Ballew also claimed that she had received permission from Ackles to skip the meeting. Linehan attempted to contact Ackles but was unable to reach him. When Linehan finally spoke to Ackles, he had already discussed the matter with Ballew. Ackles told Linehan that he could no longer discipline Ballew without his (Ackles') permission.

Troubled by the incident, on November 14, 2005, Linehan filed a complaint with the human resources office, alleging a hostile work environment. Later that day, Ackles told Linehan that he was "going to make a change in chief deputies" but did not provide an explanation. During the same conversation, and on several other occasions, Ackles told Linehan to get his hostile work environment complaint "taken care of." Ackles also said that he wanted a smooth transition to the next chief deputy coroner and that Linehan was to continue performing his duties until the transition occurred. Linehan continued to receive the same pay, although he was stripped of responsibility for supervising employees. The office staff were later informed that Linehan would no longer be chief deputy coroner. They were told to consult Keith Conaway, a white deputy coroner, regarding runs and Ballew regarding death certificates. Linehan's understanding was that he would become a deputy coroner once he was removed as chief deputy.

Linehan subsequently left on a previously scheduled vacation. Just prior to his departure, he received a call from a reporter about an investigation into the ghost employment allegations. Linehan called the city's legal office, but it too was unaware of any investigation. While he was away, however, a news story came out quoting Ackles as saying that Linehan was being investigated. Upon returning to work, Linehan discussed the ghost employment allegations with Ackles and expressed disappointment that he told the media about a non-existent investigation. Linehan also discovered papers in his office left by Ballew, including a list of tasks she intended to undertake as chief deputy coroner, a plan to review the office's pathology contract, and a copy of the anonymous letter accusing Linehan of ghost employment.

On December 2, 2005, Linehan received a letter from Ackles terminating his employment. The letter stated that Linehan's "termination for this position of Chief Deputy Coroner is effective immediately" but provided no explanation as to why he was being fired. Ackles later testified that he took action against Linehan because he (Ackles) had "lost confidence and trust" in Linehan, citing among other things Linehan's "nit-picking" of certain employees, his mishandling of the investigation into the missing funds, and his failure to inform Ackles about the raise.

Conaway took over Linehan's duties on an interim basis. A few weeks later, however, Ackles named Ballew as Linehan's permanent replacement. Linehan later testified that, due to several discriminatory and retaliatory

actions, he sought "[w]eekly" treatment for "[s]everal months" for "[s]ituational depression."

After Linehan left, Ackles and Ballew cancelled the coroner's office's contract with Forensic Pathology Associates (FPA), a company that performed autopsies for the county. They ultimately hired one non-FPA pathologist and four FPA support staff, all of whom were African-American, and declined to hire any FPA pathologists or other support staff, all of whom were white.[3] During this time, a receptionist overheard Ackles and Ballew discussing the pathology contract. Ackles "was kind of laughing and said, 'I will put my people where they belong.'" Ballew was "kind of laughing back" and responded, "'We're in charge?' and he said, 'Yup.'"

In February 2006, Linehan filed an EEO charge against the coroner's office, alleging discrimination on the basis of race, sex, and age and retaliation for prior protected activity. He claimed that the coroner's office took action against him on November 14, 2005, when he was relieved of certain duties as chief deputy, and on December 2, 2005, when his employment was terminated.

---

[3] Two FPA pathologists, along with FPA itself, subsequently filed a complaint accusing the county, Ackles, and Ballew of reverse race discrimination regarding the termination of their contract. The defendants' motion for summary judgment in that case was recently granted, and the plaintiffs have appealed. *See Radentz v. Marion County*, No. 1:07-cv-1161, 2010 WL 503025 (S.D. Ind. Feb. 8, 2010), *appeal docketed*, No. 10-1523 (7th Cir. Mar. 4, 2010).

Linehan was protected by the Government Employee Rights Act (GERA)[4] because, as chief deputy coroner, he was an "individual chosen or appointed" by a state or local official (here, the coroner) "to serve the elected official on the policymaking level." *See* 42 U.S.C. § 2000e-16c(a). As a result, his charge was processed through an administrative proceeding before the EEOC. *See id.* at § 2000e-16c(b)(1).

After hearing all of the evidence, the ALJ determined that Ackles' testimony was incredible, vague, and contradictory. He also found that the reasons Ackles gave for taking action against Linehan were pretextual. The ALJ concluded that Linehan was demoted on the basis of his race, and terminated on the basis of his race and in retaliation for his internal complaint against Ackles.[5] The EEOC affirmed in all relevant respects, finding that: (1) substantial evidence supported the ALJ's conclusion that Ackles' reasons for taking action against Linehan were pretext for race discrimination; (2) the EEOC had jurisdiction over the retaliation claim because Linehan

---

[4] As its title suggests, GERA extends workplace discrimination rights to certain government employees exempted by Title VII. *See Bd. of County Comm'rs v. EEOC*, 405 F.3d 840, 843 (10th Cir. 2005); *Brazoria County v. EEOC*, 391 F.3d 685, 689 (5th Cir. 2004).

[5] The ALJ denied Linehan's claim that his demotion constituted retaliation because he found that Ackles decided to demote Linehan before he filed his internal complaint. The ALJ also found insufficient evidence of sex and age discrimination.

remained in a policymaking position until his termination; and (3) the compensatory damage award was not "monstrously excessive."

Pursuant to GERA, we uphold the EEOC's order unless it was: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with law; (2) not made consistent with required procedures; or (3) unsupported by substantial evidence." 42 U.S.C. § 2000e-16c(d). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). It is more than a scintilla but less than a preponderance. *Id.*

The first issue is whether there was substantial evidence of race discrimination. Although the coroner's office expended considerable ink in its briefs arguing about the prima facie case, at oral argument, its counsel accurately conceded that, at this juncture, the "heart" of the matter is the finding of pretext. *See generally United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 713-15 (1983) (criticizing the parties' focus on the prima facie case after a trial on the merits); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) (noting that courts can proceed directly to the pretext inquiry where, as here, the defendant offered a nondiscriminatory reason for its action). When conducting a pretext analysis, we ask only whether the employer's explanation was "honestly believed." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). An employee may demonstrate that his employer's reason was pretextual by showing that the reason had no basis in fact or was insufficient to motivate the employment

action. *Davis v. Wisconsin Department of Corrections*, 445 F.3d 971, 977 (7th Cir. 2006).

The EEOC determined that Ackles' stated reason for taking action against Linehan—namely, that Ackles had "lost confidence and trust" in Linehan—was pretextual. Substantial evidence supports this finding. For example, Ackles testified that he lost confidence and trust in Linehan because he was "nit-picking" certain employees, including Ballew and the janitor. Putting aside the fact that Ackles' so-called disagreements with Linehan about Ballew were the very basis for Linehan's race discrimination claim, a wealth of evidence supported Linehan's decision to discipline her, which he did only once. Furthermore, Ackles admitted that Linehan did not have the ability to fire employees, casting doubt on Ackles' assertion that he feared Linehan would terminate Ballew. And as for the janitor, the evidence showed that Linehan found missing property in the janitor's closet. Ackles himself acknowledged that, under those circumstances, it would be proper to discipline the janitor. The EEOC therefore could have reasonably found that these reasons were insufficient to motivate the employment action.

Relatedly, the coroner's office also claims that Ackles disapproved of Linehan's handling of the investigation into the missing funds. As we pointed out at oral argument, however, it is hard to see how Linehan's handling of the investigation—which included contacting the city's legal office and following its instructions to file a police report—could be worthy of disapproval. But in any event, the EEOC found that Ackles never testi-

fied that Linehan's handling of the investigation contributed to Ackles' loss of confidence or trust in Linehan. This explanation could accordingly be dismissed.

Ackles also testified that he was dissatisfied with Linehan's raise. The EEOC found his testimony incredible, however, because Ackles reviewed the budget providing for the raise when he was elected. Moreover, as Ackles knew, Linehan prepared the budget when he was serving as the interim chief deputy coroner. At that time, Linehan could not have known that he would be in the position of chief deputy coroner the following year. The coroner's office now argues that Ackles was upset not because of the raise itself but because he heard about the raise from someone other than Linehan. Considering that Ackles reviewed the budget when he took office, this reason too is unconvincing.

Like the EEOC, we need not address every piece of evidence in the record. *See Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The point is that there was enough evidence to demonstrate that Ackles' stated reason for taking action against Linehan was pretextual. Ackles' lack of credibility, combined with his stated preference for employing African-Americans and his actions taken in furtherance of that goal,[6] was sufficient for

---

[6] The coroner's office attempts to refute the evidence on this point by arguing that Ackles hired Linehan, a white male, and replaced him with Conaway, another white male. But as we previously discussed, Ackles hired Linehan because he was already performing the chief deputy duties, and Ackles

(continued...)

the EEOC to find that Linehan was subjected to race discrimination.

The next issue is whether the EEOC had jurisdiction over Linehan's retaliation claim. To repeat, the parties agree that, until November 14, 2005, Linehan was an "individual chosen or appointed . . . to serve the elected official on the policymaking level" and therefore covered by GERA. *See* 42 U.S.C. § 2000e-16c(a)(2). The coroner's office argues that the EEOC lacked jurisdiction over Linehan's retaliation claim, however, because he was no longer a policymaking employee when he was fired on December 2, 2005. The resolution of this issue turns on the significance of the events of November 14.

On that day, Ackles told Linehan that he was "*going* to make a change in chief deputies." (Emphasis added.) Ackles also said that Linehan was to continue performing his duties until the transition occurred. Although the office staff were told to consult other deputies regarding certain matters, and Linehan was stripped of responsibility for supervising employees, he continued to receive the same pay and retained other policymaking duties. Furthermore, the letter that Linehan received on December 2 stated that his "termination for this position of *Chief Deputy Coroner* is effective immediately." (Emphasis added.) Thus, it was reasonable for the EEOC

---

[6] (...continued)
wanted continuity in the office. And as for Conaway, he only took over on an interim basis for a few weeks until Ballew was permanently installed.

to conclude that, although he previously had been stripped of certain duties, Linehan continued to be employed as chief deputy coroner, and therefore on the policymaking level, until he was fired.[7]

The final issue is whether the compensatory damage award of $200,000 was acceptable. In reviewing these determinations, we typically ask: (1) whether the award is "monstrously excessive"; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is comparable to those in similar cases. *Fox v. Hayes*, 600 F.3d 819, 845 (7th Cir. 2010). "An award for nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Engineering & Manufacturing Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001).

That said, the evidence here does not come close to supporting the $200,000 award for compensatory damages. The testimony on Linehan's suffering was extremely brief and only indicated that Linehan had undergone "[w]eekly" therapy sessions for "[s]everal months" for "[s]ituational depression." Nor are the under-

---

[7] At oral argument, we questioned the coroner's office's construction of the statute in question, which would result in the splitting of claims that arose three weeks apart. The office's counsel replied that the statute only needed "reading," not construction. We disagree that the plain language of the statute points directly to a conclusion in this case. Rather, we conclude that the EEOC's finding here was reasonable.

lying facts of Linehan's case—to sum up, he was fired from a political post because of his race and in retaliation for filing an internal complaint after a few verbal altercations with his superior—so extraordinary as to warrant such an award. *Cf. Neal v. Honeywell, Inc.*, 191 F.3d 827, 832 (7th Cir. 1999) ("Had Neal merely lost her job as a result of the discrimination, we would think $200,000 excessive, even though Neal suffered ostracism, a year-long depression, and upheaval in her life. But Neal's claim is out of the ordinary, given the threats of physical injury."); *Avita v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1229-30 (7th Cir. 1995) (finding award of $21,000 excessive for a plaintiff who was still "deeply distressed" years after incurring a retaliatory discharge).

In an attempt to justify the amount awarded, Linehan and the EEOC rely heavily on our decisions in *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558 (7th Cir. 2006), and *Deloughery v. City of Chicago*, 422 F.3d 611 (7th Cir. 2005). *Farafaras*, in which we upheld an award of $200,000, is readily distinguishable as it involved "repeated physical and verbal harassment" and multiple witnesses who testified about the plaintiff's distress. *Farafaras*, 433 F.3d at 566. *Deloughery*, in which we upheld a remittitur from $250,000 to $175,000, involved a plaintiff who, unlike Linehan, did not seek professional help after she was denied a promotion. Nevertheless, the plaintiff testified that she was devastated by not being promoted, detailed several obstacles that she had overcome in her life, and explained the dramatic impact of her employer's decision on herself and her family. A co-

worker also testified about the "demoralizing impact" of the employment action on the plaintiff. *Deloughery*, 422 F.3d at 615. In short, the evidence in *Farafaras* and *Deloughery* provided a much stronger basis for a $200,000 award than the evidence here.

When asked at oral argument what Linehan's award should be, the coroner's office's counsel replied, "Zero." While we agree that the amount is excessive under the circumstances, surely some measure of compensatory damages for emotional distress is warranted. Based on our review of the evidence and comparable cases, we believe that a remittitur to $20,000 would keep the award within rational limits. If the respondents do not consent to the remittitur, there will be a new hearing on the issue. *See Fox*, 600 F.3d at 846.

For the foregoing reasons, the petition for review is DENIED IN PART and GRANTED IN PART. The compensatory damages award is VACATED, and the matter is REMANDED to the EEOC for proceedings consistent with this opinion.