In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 07-2249, 07-2296 & 07-2297

ARCHIE D. THOMPSON, JR.,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*


MEMORIAL HOSPITAL OF CARBONDALE,
formerly known as AMERICAN HOME
PRODUCTS CORPORATION,

*Defendant-Appellant,*
*Cross-Appellee,*

and


JACKSON COUNTY, ILLINOIS, d/b/a
JACKSON COUNTY AMBULANCE SERVICE,

*Defendant,*
*Cross-Appellee.*


Appeals from the United States District Court
for the Southern District of Illinois.
No. 04 C 4162—**G. Patrick Murphy**, *Judge.*


ARGUED SEPTEMBER 15, 2008—DECIDED NOVEMBER 3, 2010

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Archie D. Thompson, Jr. was the only African-American paramedic in the Southern Illinois Regional Emergency Medical System. He was reduced to probationary status after he assisted a diabetic patient in her home but did not call medical control after the patient declined further treatment, even though other paramedics had handled diabetic patient responses the same way and were not disciplined. A jury agreed with Thompson that he was placed on probation only because of his race and awarded him $500,000. Memorial Hospital of Carbondale appeals the jury's verdict against it. Although it defended its case at trial on the basis that race was not the reason for the probation decision, it argues different theories on appeal. We conclude that none warrant reversal. Because it knew before trial that whether Memorial and Thompson had a contractual relationship was a factual question but it did not raise the issue at trial, we affirm the judgment on Thompson's 42 U.S.C. § 1981 claim. A jury could have drawn the inference that Paula Bierman, the Emergency Medical System Coordinator, had a singular influence on the probation decision, so the admission of her racial animus was not an abuse of discretion. And in light of the fact that it did not argue to the jury that Thompson had failed to suffer a materially adverse employment action, we deny its request to set aside the verdict on that basis. We do, however, find that remittitur of the $500,000 verdict to $250,000 is warranted. Finally, we deny Thompson's cross appeal of the grant of summary judgment against him on his claims of hostile work envi-

ronment and constructive termination, as the circumstances here did not rise to those levels.

## I. BACKGROUND

Memorial Hospital of Carbondale is responsible for medical control of the Southern Illinois Regional Emergency Medical System. The Jackson County Ambulance Service (JCAS) served the Southern Illinois Regional Emergency System. Archie Thompson became a JCAS paramedic in 1998. Thompson was the only African-American paramedic with JCAS and the only African-American who had worked as a full-time paramedic in the system.

On September 29, 2003, Thompson responded to a call for a diabetic emergency, to an address he recognized as the site of a previous diabetic call. When he arrived, he found a woman lying on her bed and immediately checked her blood glucose level. He administered D50, a dextrose solution, and the woman immediately came to. Thompson told her that the ambulance could take her to the hospital, but the woman declined and asserted that she did not want further assistance. After the woman signed a form refusing further medical treatment, Thompson returned to his ambulance base.

When he arrived back at his base, he spoke with Tim Brumley, the JCAS supervisor on duty at the time. Brumley asked Thompson whether he had called medical control before accepting the patient's refusal of further treatment, and Thompson responded that he had not.

Brumley told Thompson that he should have contacted medical control because the call had been an advanced life support call where Thompson had started an IV and administered the dextrose solution. Thompson said he would make the call in the future. The next day, Thompson responded to a diabetic call, and he called medical control before he returned to his base.

The System had protocols in place for different scenarios, including responses to diabetic emergencies. The protocol in effect in September 2003 provided that upon responding to a diabetic emergency call, a paramedic should call medical control after administering a dextrose solution and before leaving the patient. This protocol, which had been updated about two years earlier, was not available in up-to-date form in Thompson's ambulance or at his base in September 2003, and Thompson maintained he did not know about it.

After Brumley spoke with Thompson, he checked with other paramedics to assess whether they had also failed to contact the hospital under similar circumstances. Paramedic Aaron Glen, who is white, told Brumley that he had handled a diabetic call the same way that Thompson had, and another paramedic acknowledged that he might have handled a diabetic call the same way. Brumley then contacted Paula Bierman, who was the System's Emergency Medical System Coordinator. She began in that role in 1992. Brumley informed Bierman that there was a problem with paramedics' responses to diabetic calls. He described the September 29, 2003 diabetic emergency in which Thompson had not called

medical control. Bierman asked Brumley to write an incident report, which Brumley did. Within a few days, Brumley also informed Bierman that Glen said he had been handling diabetic calls the same way as Thompson had.

On October 3, 2003, Bierman wrote on the bottom of Brumley's incident report that system protocols had not been followed regarding contacting medical control in diabetic emergencies. Bierman also wrote a one-page letter to Dr. Daniel Doolittle, the Medical Director at Memorial, a position he assumed in 2003. Bierman's letter began, "Archie Thompson handled this call with a total disregard for System protocols and requirements." She wrote that his failure to know the protocol was "an unacceptable excuse" and also that Thompson had failed to maintain proficiency in drip rates and dosages as evidenced by a recent examination where he missed ten of twelve questions, and that the failure was serious and warranted immediate disciplinary action. Bierman also informed Dr. Doolittle that a memorandum had been sent to all JCAS personnel reinforcing the importance of following protocol and notifying them that failure to comply is cause for dismissal.

Within a few days of receiving Bierman's letter, Dr. Doolittle specifically asked Bierman whether she was aware of anyone else who had not followed the protocol, and Bierman responded "no." Dr. Doolittle also asked Bierman to run reports to check whether any other paramedic had violated this protocol. Bierman reported back that she did not locate any other instances.

Dr. Doolittle did speak with Gerald Lence, a JCAS supervisor who said he thought Thompson should be suspended, and two other supervisors, one of whom thought other paramedics had failed to follow the diabetic protocol but was not sure.

On October 6, 2003, Bierman drafted and signed Dr. Doolittle's initials on a "Report of Disciplinary Action" which stated that Thompson is "removed from primary paramedic duties until further notice and investigation is complete." The reason given was twofold: (1) Thompson initiated advanced life support procedures and discontinued treatment on a hypoglycemic patient without contact with medical control, and (2) Thompson was unable to demonstrate competency in the system drug administration and had missed ten out of twelve drug calculation questions on a quiz. All the other paramedics took the drug calculation quiz as well, but Bierman acknowledged at trial that despite requests to produce the tests, the only test that could be found was Thompson's.

Bierman and Dr. Doolittle met with Thompson on October 6, and two days later, Thompson received a letter stating that he had been placed on paid probation for three months. The letter noted the violation of protocol and the drug calculation test score, and it also mentioned that Thompson had weakness in communication skills and that his radio reports lacked organization and failed to relay important medical information and assessment. Bierman sent an email the same day to the JCAS paramedic supervisors advising them that Thompson

"will undergo strict disciplinary action." The email said he had been "reduced to probationary status" and directed that supervisors were to observe Thompson's performance and not intervene unless absolutely necessary. In addition, supervisors were not to give Thompson feedback on how he handled the calls except to protect a patient, even if he requested feedback. The reduction to probationary status meant that Thompson had to be supervised on all calls. His work schedule also would be altered with various days and shifts, and additional testing or skill demonstration could be imposed.

Thompson was the only paramedic in the system placed on probation for violating the diabetic protocol, although Dr. Doolittle, Brumley, and Dottie Miles, the Director of the Ambulance Service, all testified that violating the protocol was a serious matter and that anyone who violated the protocol should be disciplined in the same manner. Thompson testified that during his probation, while he was supervised by Lence, he was exposed to a homeless person's blood and that even though he asked for assistance because the person was bleeding, no supervisors assisted him.

Thompson also testified that before he became a full-time paramedic, Bierman called him into her office and said he was about to become a paramedic and could not do what other paramedics do. He recounted at trial: "And I looked at her and I said, Paula, what do you mean? Is it because I'm black I can't do what other paramedics do? She said, yes, it's because you are black you can't do what other paramedics do, and I'll be watching you." Thompson stated that he was shocked, humiliated,

and in disbelief after the conversation. On another occasion, he said, Bierman threatened him that he would be hearing from her and said that because he was black, he would not be able to do what other paramedics did. He also stated that on one occasion in the hospital emergency room, Bierman criticized him, testifying, "[a]nd if my memory serves me right, and I know it does, she reminded me again that I couldn't do what other paramedics do because I am black." Thompson also testified that Bierman came up to him one day in about 2001 and said she was thinking about having a party in her home but could not invite Thompson because she was unsure what her neighbors would think if she had a black person at her house.

Thompson also discussed various other tests he had taken over the years on such subjects as pediatrics, advanced cardiac life support, pediatric advanced life support, and basic trauma life support, all of which he passed. He said he had taken about 20-25 quizzes from 1997 through 2003 and had passed them all until the drug calculation quiz. With respect to this test, he explained that he had been home asleep and then was called to come to work early. When he arrived, he was administered a quiz that asked questions regarding drip rates. Thompson said he had not received very much education concerning drip rates, and, as a result, he usually called into the hospital if the need arose, and the hospital would tell him what drip rate to use. Thompson stated that all the paramedics who took the drip rate test received low scores.

Another former paramedic, Kelly Owens, testified that she had not called medical control in D50 situations, and that it would have been obvious from her reports. She also stated that Bierman had not reviewed her reports. Owens also testified about Lence. She said she asked one day whether there were any new hires, and Lence responded that someone had applied but "that we were not going to have that here any more." When Owens asked what he meant, Lence said "he told me that she was half-and-half, as far as African-American and half-white and we were not going to hire her." She also testified that she heard other employees use derogatory terms in Lence's presence when referring to African Americans, including the terms "nigger" and "coon," and that Lence allowed it to go on. After that testimony, the court gave the jury an instruction that the evidence was "admitted for the limited purpose of assisting you in determining the credibility of the statements alleged to have been made by Gerald Lence, specifically there are in the record these run reports that we heard about yesterday where he stressed the performance of the plaintiff in this case."

Laura Herzog, a licensed clinical professional counselor, also testified. She said that Thompson first came to see her in November 2003. She testified that he was articulate, sad, and often tearful in the session. He discussed how his stress at work had made him increasingly emotional and irritable, and he was feeling increasing anxiety and sadness. She diagnosed him with an adjustment disorder, depression and anxiety. Thompson visited Herzog four more times. He took a medical leave

of absence from work and then decided not to return to work, leaving him without insurance to pay for further counseling sessions.

Thompson filed suit against Memorial Hospital of Carbondale and Jackson County Ambulance Service alleging, as relevant here, racial discrimination in violation of Title VII and section 42 U.S.C. § 1981, as well as hostile work environment and constructive discharge claims. The district court granted summary judgment in favor of Jackson County Ambulance Service on all the claims against it. Therefore, the claims that remained for trial were Thompson's allegations against Memorial of racial discrimination in violation of Title VII and section 1981. Memorial argued at trial that the only issue the jury had to decide was whether it had made the probation decision because of Thompson's race. The jury ruled in Thompson's favor, and it awarded him $500,000. Memorial Hospital appeals, and Thompson cross-appeals the grant of summary judgment against him on the hostile work environment and constructive discharge claims.

## II. ANALYSIS

### A. Thompson's Cross Appeal

We begin with Thompson's cross appeal, in which he argues that the district court should not have granted summary judgment in the defendants' favor on his hostile work environment and constructive discharge claims. Our review of a grant of summary judgment is de novo, and we construe all facts and take all reasonable

inferences in favor of the nonmoving party. *Poer v. Astrue*, 606 F.3d 433, 438-39 (7th Cir. 2010).

To constitute a hostile work environment under Title VII, the alleged harassment must be both subjectively and objectively so severe or pervasive that it alters the conditions of the plaintiff's employment. *See Dear v. Shineski*, 578 F.3d 605, 611 (7th Cir. 2009). Thompson points to a statement from Lence in 2002 that Thompson's children would look like the black beans that were in a jar and an instance in March 2002 when Larry Jolly dared Thompson to call him a racist. These comments took place outside his presence. *Cf. Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). Thompson did point to a few statements made directly to him, including Bierman's statement that Thompson could not do what others could do because he was black and another where she said she was not sure what her neighbors would think if she invited a black person to her home. Although we by no means condone this conduct, we agree with the district court that these circumstances do not reflect severe or pervasive enough conduct to be actionable under Title VII. *See Ford v. Minteq Shapes and Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009).

Thompson also appeals the grant of summary judgment to the defendants on his constructive discharge claim. A plaintiff proceeding under this theory must demonstrate a work environment that is even more egregious than that needed for a hostile work environment such that he was forced to resign because his working conditions, "from the standpoint of the rea-

sonable employee, had become unbearable.'" *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (quoting *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)). Because we affirm the grant of summary judgment on his hostile work environment claim, Thompson's constructive discharge claim falls as well. *See Bannon v. Univ. of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007).

## B.  Memorial Hospital's Appeal

Memorial makes several arguments on appeal, among them that it did not have a contractual relationship with Thompson for purposes of section 1981, that he did not suffer a materially adverse employment action, and that Bierman was not a decision maker (and so the jury should not have heard racially charged comments she had made). Despite the understanding that these questions presented factual matters for trial, Memorial did not present these theories to the jury. Instead, Memorial made it clear before and during trial that its only defense was that its disciplinary decision was not made because Thompson was black.

In its first pre-trial motion, for example, Memorial stated that "the single issue remaining in dispute is whether Plaintiff was subjected to disparate treatment when he was placed on probation by Daniel Doolittle on October 8, 2003." Its closing argument made explicitly clear that it was defending the case only on the ground that Thompson had not been reduced to probationary status because of his race. It told the jury in closing: "The only thing you have to decide [is] was

this decision to put him on probation made because he's African American? That's the only decision you have to make. And the answer to that is no." Memorial closed its argument by asking the jury to return a verdict against Thompson "because he has not met his burden to prove to you that the decision to place him on probation, the decision Dr. Daniel Doolittle made, that that decision was because of his race. And that, ladies and gentlemen, is the only issue that you are here to decide."

Consistent with how Memorial defended the case at trial, the jury was instructed, without objection, as follows:

> Plaintiff claims that he was placed on probation because of his race. To succeed on this claim, plaintiff must prove by a preponderance of the evidence that he was placed on probation because of his race, African-American. To determine that plaintiff was placed on probation because of his race, you must decide that defendant would not have placed plaintiff on probation had he had not been African-American but everything else had been the same. If you find that plaintiff has proved this claim by a preponderance of the evidence, then you must find for the plaintiff. However, if you find that plaintiff did not prove his claim by a preponderance of the evidence, then you must find for the defendant.

As we detail further below, Memorial's attempts to defend its case on appeal on theories not argued to the jury do not succeed here.

### 1. Section 1981

Thompson's claims included one under 42 U.S.C. § 1981, which provides that "[a]ll persons within the jurisdiction shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). For section 1981(a) purposes, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. 1981(b). Section 1981 prohibits discrimination against employees on the basis of their race provided there is a contractual relationship. Memorial argues on appeal that it did not have a contractual relationship with Thompson that was actionable under section 1981, and that the district court should have granted its motion to dismiss the section 1981 claim or its motion for a judgment as a matter of law on the claim.

But although Memorial acknowledged that whether a contractual relationship existed between Thompson and Memorial was an issue of fact, Memorial never asked the jury to make that determination. In denying Memorial's motion to dismiss the section 1981 claim, the district court stated that factual development was needed to determine whether there was a contract of employment for section 1981 purposes. Evidence adduced later included that all paramedics served under Memorial's Medical Director, that persons could not be hired by the ambulance service without approval of the hospital, that the Medical Director and EMS system

controlled whether a person can work in the system as a paramedic, and that Thompson was a party to a collective bargaining agreement. Memorial explicitly stated in its motion for summary judgment: "In denying [Memorial]'s Motion [to dismiss Count II of the complaint], the court specifically held that factual development was needed to determine whether plaintiff had a contract of employment sufficient to sustain a § 1981 claim. . . . While a dispute may exist as to whether Thompson had a contract and with whom the contract was made, this dispute is not material for purposes of summary judgment." (Memorial argued that summary judgment on the section 1981 claim was warranted for other reasons, including a lack of discriminatory intent.) So Memorial took the position before trial that the argument it makes now—whether Thompson had a contract with it for section 1981 purposes—was a factual question. And as we discussed, Memorial made the strategic decision to defend the case at trial only on the ground that race was not the reason Thompson had been disciplined.

It did not make the contract argument to the jury or request a jury instruction on the contractual question. Memorial has therefore waived this argument. *See Staub v. Proctor Hosp.*, 560 F.3d 647, 655-56 (7th Cir. 2009), *cert. granted*, 130 S. Ct. 2089 (2010); *United States v. Jaimes-Jaimes*, 406 F.3d 845, 848 (7th Cir. 2005); *see also Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 871 (7th Cir. 2010) (argument forfeited because plaintiff did not propose instructions that would have asked the jury to determine whether she had merely failed to avoid

avoidable consequences, rather than having been contributorily negligent).

### 2.   Comments by Bierman and Lence

In light of the district court's grant of summary judgment in its favor on Thompson's hostile work environment claim, Memorial argues that the jury should not have heard certain comments made by Bierman and Lence. The jury heard comments Bierman made to Thompson, including that he could not do what others could do because he was black. The jury also heard that Lence made racially insensitive remarks and did not take action when other employees used racial slurs in his presence. We review the district court's decision to admit this evidence for an abuse of discretion. *See Griffin v. Foley*, 542 F.3d 209, 217 (7th Cir. 2008).

We turn to Bierman's comments first. Memorial filed a motion in limine to exclude Bierman's comments, arguing that she had not made the decision to place Thompson on probation and that any racial animus she held was therefore not relevant. The district court denied the motion but made it clear that Memorial's counsel could prepare a limiting instruction that it would give to the jury to ensure the jury did not consider Bierman's remarks for an improper purpose or as relevant to any claim that had been dismissed. Counsel stated it would provide a limiting instruction, but it never did.

We have said that when an employee is not a decision maker, her animus is relevant only if she exerted such

significant influence over the decision that her animus can be imputed to the decision maker. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 508 (7th Cir. 2010). Whether that influence must be a singular influence is unclear in our circuit. *See Kodish*, 604 F.3d 490, 508 (7th Cir. 2010) (discussing different standards employed); *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009) (holding singular influence necessary), *cert. granted*, 130 S. Ct. 2089 (2010).

Our case law in this area has not been entirely consistent, and the resolution of the Supreme Court's recent grant of certiorari in *Staub* will help clarify this area of the law. To the extent a singular influence is necessary, we have described it as "one in which a subordinate employee possesses so much influence and power over the nominal decision maker that the employee, for all intents and purposes is in fact, the true functional decision maker." *Kodish*, 604 F.3d at 508. In *Kodish*, for example, all of the board's information passed through a chief, the board did not conduct its own investigation or gather any of its own information, and, although it might have reviewed some employment evaluations, two of the four were written by the chief. *Id.* at 509. We concluded that it was a plausible inference, if not the sole inference, that the chief had exerted a singular influence over the board. Particularly relevant here, we have noted that singular influence may be exercised by, among other things, "supplying misinformation or failing to provide relevant information to the person making the employment decision." *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007). That said,

"where a decision maker is not wholly dependent on a single source of information, but instead conducts its own investigation into the facts relevant to the decision, the employer is not liable for an employee's submission of misinformation to the decision maker." *Id.* at 918. So we have rejected the so-called "cat's paw" theory when there is "neither singular influence nor proof that the decision maker's review was 'anything but independent . . .'". *Staub*, 560 F.3d at 657 (quoting *Metzger v. Ill. State Police*, 519 F.3d 677, 682 (7th Cir. 2008)).

We discussed our suggested approach to the potential admission of "cat's paw" evidence in *Staub* and wrote that a judge should make the threshold determination of whether a reasonable jury could find singular influence. 560 F.3d at 658. Then, and only then, should the judge "[a]llow[ ] the jury to entertain a cat's paw theory and decide whether there was singular influence." *Id.* That is the procedure the trial court followed here. The court read and heard argument as to each party's position after Memorial filed its motion in limine, and the court determined there was enough evidence to proceed to a jury on this point. At trial, Memorial did not request any jury instructions that concerned the decision maker or the "cat's paw" theory. There was an instruction given without objection from Memorial that "Memorial Hospital of Carbondale is a hospital corporation and can only act through its officers and employees." Bierman is unquestionably a Memorial employee, and the record does not reflect that Memorial requested any instructions in an attempt to clarify the relevance of decision makers. *Cf. Staub*, 560 F.3d at 657-58 (discussing instruction given

to jury that set forth the cat's paw theory).[1] Thompson actually requested an instruction on decision maker status, but it was rejected. So despite the fact that Thomp-

---

[1] The instruction in *Staub*, in stark contrast to the instruction here, detailed the cat's paw theory for the jury after stating that the corporation could only act through its officers and employees. (Note that we do not reproduce it as an example of a model jury instruction, as we stated in *Staub* our preference for a fact-driven instruction.) It said:

> The Defendant is a corporation and can act only through its officers and employees. Animosity of a coworker toward the Plaintiff on the basis of Plaintiff's military status as a motivating factor may not be attributed to Defendant unless that co-worker exercised such singular influence over the decision maker that the co-worker was basically the real decision maker. This influence may have been exercised by concealing relevant information from or feeding false information or selectively-chosen information to the person or persons who made the decision to discharge Plaintiff.

> If the decision maker is not wholly dependent on a single source of information but instead conducts its own investigation into the facts relevant to the decision, the Defendant is not liable for a non-decision maker's submission of misinformation or selectively chosen information or failure to provide relevant information to the decision maker. It does not matter that much of the information has come from a single, potentially biased source, so long as the decision maker does not artificially or by virtue of her role in the company limit her investigation to information from that source.

*Staub*, 560 F.3d at 657.

son raised the issue by presenting such an instruction, Memorial did not seek one itself. *Cf. Fox v. Hayes*, 600 F.3d 819, 838 (7th Cir. 2010) (finding defendants failed to preserve objection to failure to give instruction where defendants did not request one).

In any event, it is clear that a jury could have found that Bierman gave Dr. Doolittle critical misinformation. A jury also could have concluded that Dr. Doolittle's review was not "anything but independent" and that Bierman exerted a singular influence over the probation decision. Tim Brumley, the supervisor on duty when Thompson failed to follow the protocol, told Bierman that Thompson was not the only paramedic to fail to follow the protocol. Although Bierman knew that information was important to the discipline decision and Dr. Doolittle specifically asked her whether any other paramedics had failed to comply with it, she falsely told him no one else had. Only Bierman spoke with Brumley; Dr. Doolittle did not. Dr. Doolittle did not review the reports of the paramedics' runs; only Bierman did. She told him that they showed no other failures of the diabetic protocol, but the jury heard from another paramedic who said she had not followed protocol, which would have been reflected in the run reports. Dr. Doolittle also did not review the paramedics' tests. Only Bierman did, and Thompson's poor score on one became one of the reasons for his probation even though Thompson said all the other paramedics also did poorly, and Memorial did not produce any evidence to the contrary. Reinforcing all this, Dr. Doolittle testified at trial that he "absolutely" relied on Bierman for much of the information that led to the probation decision.

When the time came to discipline Thompson, Bierman drafted the Report of Disciplinary Action on October 6, signed it, and placed Dr. Doolittle's initials on it. In addition to drafting the report, Thompson testified that during the October 6 meeting, Bierman, "as always," was "basically controlling the meeting" and did most of the talking during it. He said Dr. Doolittle was "sitting there" during the meeting and "seems not to know what's going on most of the time. I mean, not to sound terrible, but he seems to let her run the show." On October 8, Thompson brought a witness with him to his scheduled meeting with Bierman and Dr. Doolittle, and the jury heard that when Bierman saw that Thompson had brought a witness, she said "this meeting is over." And with that statement it was, even though Dr. Doolittle had been asking questions. So the jury could have drawn the inference that Bierman exerted a singular influence over the decision to reduce Thompson to probationary status. Her racial animus was therefore admissible, and we do not find the comments too temporally attenuated for the jury to consider them.

With respect to Lence's comments, Memorial argues that any improper motive Lence had in compiling run reports that showed Thompson was performing unsatisfactorily was not relevant because Lence compiled them after Thompson had been placed on probation. But at trial, Memorial was the one to introduce the reports, and the district court allowed Thompson to introduce statements Lence had made to bear on the credibility of the reports Lence had compiled. The jury heard testimony that Lence had prepared some of the reports, and

that some were not satisfactory. Thompson, on the other hand, maintained that the unsatisfactory reports were unmerited. The district court specifically instructed the jury that the evidence "was being admitted for the limited purpose of assisting you in determining the credibility of the statements alleged to have been made by Gerald Lence, specifically there are now in the record these run reports that we heard about yesterday where he assessed the performance of the plaintiff in this case. I'm admitting this evidence that you just heard for the limited purpose of determining whether those reports are credible." We find no abuse of discretion in this ruling. *See* Fed. R. Evid. 806 (stating that when hearsay statement admitted into evidence, credibility of declarant may be attacked).

### 3. Materially Adverse Employment Action

Memorial also argues that Thompson did not suffer an adverse employment action and that the district court therefore should have granted its post-trial motion for judgment as a matter of law that raised this issue. We review the district court's denial of a post-trial motion for judgment as a matter of law de novo. *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009).

" 'The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace.' " *Phelan v. Cook County*, 463 F.3d 773, 780 (7th Cir. 2006) (quoting *Hunt v. City of*

*Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000)). Memorial argued in its motion for summary judgment that Thompson had failed to demonstrate an adverse employment action, and the district court denied the motion because it concluded genuine issues of material fact prevented its grant. Despite that ruling, the next time Memorial raised the adverse employment action issue was in its post-trial motion for judgment as a matter of law. Memorial did not argue to the jury that Thompson had not suffered an adverse employment action and maintained only that it had not acted because of his race. It also had not argued the lack of an adverse employment action in its Rule 50(a) motion for judgment as a matter of law.

Memorial failed to preserve this argument. Sometimes whether an action is an adverse employment question is clear as a matter of law, but "there are times where the question is not so obvious" such that it is a question of fact. *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 436 (7th Cir. 2009) (citing Seventh Circuit Pattern Jury Instruction § 3.01, Comment E, which notes that if a fact issue arises as to whether the plaintiff suffered a materially adverse employment action, "a court should modify the instructions to provide the jury with guidance as to what this term means"); *see also, e.g., O'Neal v. City of Chicago*, 588 F.3d 406, 409-10 (7th Cir. 2009) (issue of fact regarding adverse employment action where repetitive reassignments would negatively affect opportunity for promotion). Memorial did not raise this issue to the jury. Nor did it request a jury instruction. *Cf.* Seventh Circuit Pattern Jury Instruction 3.01(e) (providing a

suggested jury instruction for when a fact issues arises as to whether the plaintiff suffered a materially adverse employment action); *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 733 (7th Cir. 2004) (finding defendant waived argument that plaintiff needed to prove actual malice by failing to propose a jury instruction requiring such a finding or to object to court's instructions). Also, Memorial did not raise this issue in its Rule 50(a) motion for judgment as a matter of law. The Rule 50(a) arguments raised Thompson's failure to present evidence of racial motivation and the lack of any evidence of a similarly situated, white EMT that had been treated more favorably. But it did not argue that Thompson had not suffered an adverse employment action. "'Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.'" *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010); *cf. Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 778 (7th Cir. 2002) (reviewing issue even though not raised in Rule 50(a) motion).

The adverse action here is not so inconsequential that we will set aside the verdict. *Cf. Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 803 (7th Cir. 2010) (forfeiture rarely overlooked in civil cases). Memorial acknowledges in its brief that we have previously suggested that placing an employee on probation might constitute an adverse employment action. *See Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996). It argues, however, that this case is more analogous to *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 786 (7th Cir. 2007), where we

concluded that placing a plaintiff on paid administrative leave pending the results of his fitness-for-duty psychological examinations was not an adverse employment action. But the paid leave in *Nichols* was while the employer awaited results; the closer analogy to *Nichols* here would be if Thompson maintained that the days while the hospital was deciding whether to discipline him constituted an adverse employment action. The probation Thompson received, in contrast to the leave while waiting results in *Nichols*, was imposed *after* the hospital decided to discipline him. During the three months in which he was to be "reduced" to probationary status, Thompson was to work always under the ever-watchful eye of a supervisor and could no longer work independently. Bierman directed the paramedic supervisors not to intervene unless absolutely necessary, and that resulted in Thompson's exposure to a homeless man's blood after a supervisor watching over Thompson refused to help or let anyone else assist. During his reduction to probationary status Thompson was also required to inventory rigs, and to clean and wash the floors of the ambulances, even the ones he had not served on. *Cf. Tart v. Ill. Power Co.*, 366 F.3d 461, 473 (7th Cir. 2004) (reversing conclusion that reassigned positions not objectively inferior where employee previously worked independently and mostly indoors and then worked mainly outdoors "under the hyper-vigilant eye of a manager who told their new supervisors to work them until they quit"). To be clear, we do not hold that any imposition of a probationary period constitutes an adverse employment action. In this case, though, where

the district court ruled that whether there was an adverse employment action was a question of fact, and the hospital did not defend the case on this ground at trial, we decline to set aside the verdict.

### 4.  Remittitur

Although it did not suggest a damage figure to the jury in the event it was found liable, Memorial argues that the $500,000 verdict was too high and that remittitur is in order. We review the district court's decision not to grant a remittitur for an abuse of discretion. *Houskins v. Sheahan*, 549 F.3d 480, 496 (7th Cir. 2008). In our review, we generally look at compensatory damage awards with several considerations in mind: (1) whether the award is "monstrously excessive"; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *Marion County Coroner's Office v. E.E.O.C.*, 612 F.3d 924, 931 (7th Cir. 2010). Memorial argues that there is no rational connection between the award and the evidence. It also maintains that the award is not comparable to awards in similar cases.

We have upheld six-figure awards for nonpecuniary loss even when the plaintiff did not seek professional assistance. *See, e.g., Deloughery v. City of Chicago*, 422 F.3d 611, 621 (7th Cir. 2005) (upholding $175,000 award). Here, though, the jury heard extensive testimony from Laura Herzog, a licensed clinical professional counselor, whom Thompson saw five times after he was placed on probation. She testified that at Thompson's first

session in November 2003, he was sad and often tearful in light of the tremendous stress from his job. He told her that although he had been trying not to allow his co-workers to see him stressed, he had been crying often when he was at home, felt increasing anxiety and sadness, and had gained 20 pounds in the past month. Herzog diagnosed Thompson with adjustment disorder, depression, and anxiety, and she explained that an adjustment disorder is the development of emotional or behavioral symptoms in response to an identified stressor. When she next saw him eight days later, he reported feeling more symptoms of anxiety due to the pressure that he felt at work. Herzog characterized Thompson's symptoms as "severe," although he did not need to be hospitalized. She further testified that when she saw him on December 4, he had taken leave from work due to his stress and was improved. She saw him again a week later, and she thought he seemed improved in part because he was not at work.

Also on December 11, Herzog drafted a treatment plan for Thompson. She rated the stress he was experiencing at level four, the highest level. The plan identified that Thompson was experiencing anxiety and depression due to the stress he was having at work and worry that he would lose his job. She thought that he was doing well in therapy and had a high probability of achieving his treatment goals. Herzog saw him again at the end of December, where he was again improved and had not returned to work. Herzog testified that if Thompson went back to his work and continued to be on probation, in her opinion, it would be difficult for him and she

was not sure whether he would be able to cope with that stress. Herzog did not see him further as he no longer had insurance to pay for further sessions.

In addition to Herzog's testimony, Thompson testified at length about the effects the probation had on him. His testimony reflected that the probation not only affected him emotionally, but also that he believed he and other patients had been put in physical danger while he was on probation. For example, Thompson described a call during which Lence supervised him while Thompson was reduced to probationary status. Thompson testified that he responded to an emergency call and found a homeless man lying on the ground with a significant amount of blood coming out of his head. Thompson was the first person to the man. Concerned that the man could have a spine or back injury, he began to stabilize him. Rather than help Thompson or allow the other paramedic present to assist, Lence ordered the paramedic to go back to the ambulance for inconsequential things. Two policemen were right there with rubber gloves on ready to assist as well, but Thompson testified that Lence would not let them. When the man started to come to, he began grinding his bleeding laceration into Thompson's arm. Lence saw this, but he still would not help or let anyone help Thompson. This episode was jarring to Thompson. He was concerned about his own exposure to the man's blood. And he testified that it was "horrendous" to him that Lence knew what was going on and would not let anyone else help, and that those actions "absolutely" caused the patient to be at greater risk.

Thompson told the jury that while he was being supervised, Lence and another supervisor put his patients' safety at risk multiple times, interrupted and interceded in calls, and delayed patient care. Thompson also testified that Lence directed him to write reports on two patients that he had not even seen, a violation of protocol, despite his protest. Thompson testified that he sought counseling because his work situation was tearing him up and tearing his family up, and he described it as "unbearable." He testified that it was "like a designed hell for me to have to go through this, to be treated this way, and then see the public be treated this way. To see these patients hurt." And he testified that he felt it was a designed campaign against him to push him to quit.

Memorial points us to awards in other cases and maintains that they demonstrate that Thompson's award is excessive. We do look at other awards; "[o]ur responsibility, however, is not to fit this case into a perfect continuum of past harms and past awards. Rather, our role in reviewing awards for abuse of discretion is to determine if the award in this case was roughly comparable to similar cases, such that the instant award was not so beyond the pale as to constitute an abuse of discretion." *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 567 (7th Cir. 2006). Memorial points, for example, to our decision in *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1229-30 (7th Cir. 1995), where we deemed a $21,000 award for emotional distress damages "too much" and concluded that a remittitur of half the award was necessary. However, the testimony from the plaintiffs in

*Avitia* and *Marion County*, 612 F.3d at 631, was very brief. In contrast, we upheld a remittitur to $175,000 in *Deloughery v. City of Chicago*, 422 F.3d 611, 615 (7th Cir. 2005), where the plaintiff did not seek professional help after she did not receive a promotion but testified to her devastation at not being promoted, described obstacles she had overcome in her life, and explained the impact of the decision on herself and her family.

In addition to the testimony from Thompson and his counselor about the emotional impact of the probation, Thompson's testimony included a physical element, as he was concerned for his safety and that of his patients. In that regard this case draws some parallel to cases such as *Farfaras*, where we upheld an award of $200,000 where a plaintiff was touched and cornered, among other inappropriate actions. *Farfaras*, 433 F.3d at 566. The jury also could have thought that Thompson was treated poorly in an attempt to have him quit. *See Neem v. McKesson Drug Co.*, 444 F.3d 593, 612 (7th Cir. 2006) (affirming a $240,000 damage award under Illinois state law, where the plaintiff's supervisor had forced her to climb a metal stairway to hook up computer equipment during her complicated pregnancy, sabotaging her computer to deny her access and alter her files, and increased her work knowing she would not be able to meet the deadlines).

We review the award under an abuse of discretion standard of review, and the district court heard all the testimony and declined Memorial's request for a remittitur. The jury and district court heard extensive

testimony from Thompson and his counselor, and his counselor testified that she diagnosed Thompson with an adjustment disorder with depression and anxiety. The jury and judge heard that Thompson only discontinued treatment because he no longer had insurance coverage. They also heard that Thompson was exposed to blood from an injured homeless man and was forced to participate in and witness incidents where he felt patients who needed emergency assistance were being injured even further by paramedics. Nonetheless, we conclude that the $500,000 award is excessive in this case in light of the circumstances, including that Thompson was placed on probation with no change to his compensation and the nature of Thompson's emotional distress, which although not to be discounted, does not warrant a half-million dollar award. A remittitur to $250,000 will keep this award within rational bounds and in line with other cases. If Thompson does not agree to the remittitur, he will receive a new hearing on this issue. *See Marion County*, 612 F.3d at 931.

## III. CONCLUSION

The judgment of the district court is AFFIRMED, except with respect to the compensatory damages award, which is VACATED. We REMAND this case for further proceedings consistent with this opinion.