# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 12, 2011

No. 10-20365

Lyle W. Cayce
Clerk

DR. ADRIAN GOLLAS,

Plaintiff - Appellant

v.

UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-3613

Before BARKSDALE, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:[*]

In his action against the University of Texas Health Science Center at Houston (UTH), Dr. Adrian Gollas challenges an adverse summary judgment on his claim that, in violation of Title VII of the 1964 Civil Rights Act, § 704(a), 42 U.S.C. § 2000e-3(a), UTH terminated his third-year-residency appointment in retaliation for his opposing sexual harassment. Dr. Gollas contends the district court erred in ruling, pursuant to Federal Rule of Civil Procedure 56(a) (as amended, effective 1 December 2010), that he failed to create the requisite

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

genuine dispute of material fact on:  whether he established a prima facie case of retaliation, based on his failure to show either he engaged in protected activity, or, if he did make such showing, the existence of a causal link between that activity and his termination; and, whether UTH's legitimate, non-retaliatory reasons were pretext for retaliation. AFFIRMED.

## I.

Dr. Gollas graduated from medical school in 1992.  He later completed a one-year internship in pediatrics at Texas Tech University Health Science Center.  He has been engaged in the general practice of anesthesiology since completing a three-year residency in anesthesiology at UTH and Baylor.  In 2005, Dr. Gollas decided to become double board certified and was accepted to UTH's pediatric residency program; he was appointed as a post-graduate, year-two resident, due to his prior completion of year one at Texas Tech.  This program required that Dr. Gollas be appointed by UTH to proceed to year three.  His two-year residency began on 2 July 2006 and required monthly participation in rotations, with performance evaluations at the end of each rotation.

In late 2006, Dr. Gollas' performance declined; and he received a low evaluation for his November rotation.  The following month, Dr. Crandell, the program director, and Drs. Cua and Erickson, who both worked in the pediatric intensive-care unit (PICU), met with Dr. Gollas to discuss their concerns about his knowledge base, medical decision-making, and poor patient skills.  That same day, Dr. Gollas met with Dr. Crandell and Dr. Schroeder, the pediatrics chief resident, to discuss a medical student's allegation that Dr. Gollas made inappropriate comments to her and touched her inappropriately.  A resident similarly told Dr. Crandell that Dr. Gollas had made an inappropriate comment to her.

Dr. Gollas' evaluations improved during his December and January rotations, however;  and, on 1 February 2007, UTH appointed him to his third year of residency, to begin that July (third-year-residency appointment).  But,

during his February emergency-medicine rotation at Memorial Hermann Hospital, his performance declined again. He received low scores for that evaluation; and, Dr. Reichman, the emergency department program director, stated in Dr. Gollas' evaluation that his performance fell below that expected of a resident with his level of training. (As discussed, in addition to seeking to become board certified in pediatrics, Dr. Gollas is an anesthesiologist.) At a 22 February faculty meeting, it was determined that Dr. Gollas failed his February rotation and would be required to repeat it. (Dr. Gollas' poor performance continued during his March rotation; he failed it as well.)

During the 28 February 2007 night shift, at approximately 3:00 or 4:00 a.m. on 1 March, Dr. Gollas was involved in a shouting match in the pediatrics emergency-room hallway with Dr. Arroyo, an attending physician, allegedly concerning Dr. Arroyo's comments and gestures towards Nurse Garcia, a female. Dr. Gollas maintains he complained about sexual harassment of Nurse Garcia by Dr. Arroyo to Drs. McCarthy (emergency department medical director), Crandell (pediatrics program director), Colasurdo (pediatrics department chair), and Reichman (emergency department program director); on the other hand, they provided summary-judgment evidence that Dr. Gollas either did not complain to them or, if he did, did not complain of sexual harassment, but rather of Dr. Arroyo's treatment of him.

Upon learning that Dr. Gollas performed poorly during his February rotation, combined with his performance in PICU, his treatment of fellow residents, and episodes of inappropriate behavior, Dr. Crandell (again, pediatrics program director) recommended to Dr. Colasurdo (again, pediatrics department chair) that they reconsider Dr. Gollas' 1 February appointment for another year of residency, to begin that July. On 16 March 2007, Drs. Crandell and Colasurdo terminated Dr. Gollas' third-year-residency appointment; they notified him that same day.

No. 10-20365

In May 2007, Dr. Gollas filed a charge with the EEOC for unlawful retaliation under Title VII. In November 2008, the EEOC issued him a right-to-sue letter. Dr. Gollas then filed this action.

The district court granted summary judgment, holding Dr. Gollas failed to create a genuine dispute of material fact on: whether he established a prima facie case, based on his failure to show either he engaged in protected activity, or, if he did make such showing, the existence of a causal link between that activity and the termination of the third-year-residency appointment; and, in the alternative, whether UTH's legitimate, non-retaliatory reasons for terminating that appointment were pretext for unlawful retaliation. *Gollas v. Univ. of Tex. Health Sci. Ctr. at Hous.*, No. H-08-3613, 2010 WL 1628996, at *1-2 (S.D. Tex. 20 Apr. 2010).

## II.

In district court, UTH claimed Dr. Gollas sued the wrong party. The district court did not reach that issue. In support of the summary judgment, UTH raises that issue here. *See, e.g.*, *Gulf Island, IV v. Blue Streak Marine, Inc.*, 940 F.2d 948, 952 (5th Cir. 1991) ("[W]e are free to affirm the dismissal on any ground presented to the district court for consideration, even though it may not have formed the basis for the district court's decision". (citation omitted)). Because, for the following reasons, summary judgment was proper, we need not reach this wrong-defendant contention.

A summary judgment is reviewed *de novo*, "view[ing] facts and inferences in the light most favorable to the [nonmovant]". *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 762 (5th Cir. 2001) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". FED. R. CIV. P. 56(a). The nonmovant's burden is *not* satisfied by "conclusory allegations, speculation, and unsubstantiated assertions". *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (citation and internal quotation

4

marks omitted). Along that line, plaintiff's subjective belief, without more, that an adverse employment action was retaliatory is insufficient to survive summary judgment. *E.g.*, *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). A genuine dispute of material fact exists if the summary-judgment evidence is such that a reasonable juror could return a verdict in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where, as here, plaintiff produces only circumstantial evidence of retaliation, the well-known *McDonnell Douglas* burden-shifting framework applies. *E.g.*, *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Although originally applied in a Title VII disparate-treatment action, this burden-shifting framework applies as well in Title VII retaliation actions. *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996); *see McDonnell Douglas Corp.*, 411 U.S. at 802-04.

Under this framework, the initial burden rests on plaintiff to establish a prima facie case of retaliation. *Long*, 88 F.3d at 304. He must show: (1) his conduct constituted protected activity; (2) an adverse employment action against him following that conduct; and (3) a causal link between that conduct and that adverse action. *E.g.*, *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). An employee engages in protected activity by: "oppos[ing] any practice made an unlawful employment practice by this subchapter, or . . . ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter". 42 U.S.C. § 2000e-3(a). Dr. Gollas contends his conduct falls within the first clause: opposition. The parties do not dispute that he suffered an adverse employment action.

If plaintiff establishes a prima facie case (including the causal-link element), the burden shifts to defendant to produce a legitimate, non-retaliatory reason for its adverse employment action. *McDonnell Douglas Corp.*, 411 U.S.

at 802.  Defendant's burden is one of *production*, *not persuasion*.  *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  If defendant satisfies its burden, it shifts back to plaintiff to show defendant's reasons were pretext for unlawful retaliation; that is, but for the protected activity, the adverse employment action would not have occurred. *See, e.g.*, *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 806 (5th Cir. 2007); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999).

As discussed *supra*, to survive summary judgment, plaintiff must show "a conflict in substantial evidence on the ultimate issue of retaliation". *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (citation omitted). "Evidence is substantial if it is of such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions." *Id.* (citations and internal quotation marks omitted).  Re-stated, Dr. Gollas must show evidence sufficient to create a genuine dispute of material fact:  whether reasonable minds could differ on the ultimate issue of retaliation.

Prior to UTH's summary-judgment motion, Dr. Gollas filed in district court declarations of Nurse Garcia and Marc Mansueto, who was working at Memorial Hermann Hospital in the pediatric emergency room at the time of the incident. Also, in response to the district court's order on production, UTH filed statements from Drs. King, Arthur, Houser, Atkuri, and Williams regarding their personal observations of Dr. Gollas' performance in the pediatric emergency room.

With its summary-judgment motion, UTH provided the following additional evidence, *inter alia*: depositions of Drs. Gollas, McCarthy, Crandell, and Reichman; pediatrics end-of-rotation evaluations from 1 July 2006 through 2 April 2007; the claimed 1 March 2007 letter from Dr. Gollas to Dr. McCarthy allegedly complaining of sexual harassment ("claimed" because neither Dr. McCarthy nor Dr. Reichman (to whom it was copied) remembers receiving it);

several handwritten notes by Dr. Crandell to Dr. Gollas' file; a 6 August 2007 letter from Dr. Reichman to the accreditation council for graduate medical education (ACGME); declarations of Drs. Koerner and Colasurdo; and statements from doctors who worked with Dr. Gollas, including Drs. Koerner and Oakes.  In his opposition, Dr. Gollas provided, *inter alia*, the following summary-judgment evidence:  a letter from Dr. Robinson to Dr. Reichman, regarding Dr. Reichman's performance; Dr. Gollas' letter to the EEOC; and his affidavit.

## A.

In seeking to satisfy his initial burden of establishing a prima facie case (again, it is undisputed an adverse employment action occurred), *see, e.g.*, *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001),  Dr. Gollas challenges the district court's ruling that he failed to create a genuine dispute of material fact on:  whether he engaged in protected activity; or, assuming he did, whether there was a causal link between that activity and the adverse employment action. *Gollas*, 2010 WL 1628996, at *1-2.

### 1.

Dr. Gollas contends he engaged in protected activity by opposing an unlawful employment practice—Dr. Arroyo's claimed sexual harassment of Nurse Garcia—and reporting it to Drs. McCarthy, Crandell, Colasurdo, and Reichman.  The district court found no evidence in the summary-judgment record that Dr. Gollas opposed sexual harassment, only evidence of a shouting match between him and Dr. Arroyo.  *Id.*

In addition to his reliance on the claimed 1 March 2007 letter, Dr. Gollas offers the following summary-judgment evidence that he complained of sexual harassment to UTH:  in a 6 August 2007 letter to ACGME, Dr. Reichman stated that Dr. Gollas reported Dr. Arroyo's inappropriate comments to Dr. McCarthy; and, Dr. Reichman informed Dr. Crandell that Dr. Gollas had complained about Dr. Arroyo's conduct.  For the following reasons, and although it is a close

question, we will assume that Dr. Gollas' summary-judgment evidence that he complained of sexual harassment is sufficient to create a genuine dispute of material fact on whether he opposed an *unlawful* employment practice, thereby engaging in protected activity. 42 U.S.C. § 2000e-3(a); *see, e.g.*, *Jimenez v. Potter*, 211 F. App'x 289, 290 (5th Cir. 2006) (finding no protected activity where plaintiff claimed demotion in retaliation for filing workers' compensation claim where such claim not protected under Title VII).

First, Dr. Gollas contends that the summary-judgment evidence reflects he complained of sexual harassment on 1 March 2007 by discussing the incident with Dr. McCarthy and providing him a written complaint (the claimed 1 March letter), with a copy given to Nurse Bennett (a nurse on duty the night of the incident) to deliver to Dr. Reichman. (Again, we refer to this letter as "claimed" because neither of the doctors to whom it was addressed remembers receiving it.)  In his deposition, Dr. McCarthy stated that he spoke with Dr. Gollas, but that Dr. Gollas complained about a shouting match he had with Dr. Arroyo and Dr. Arroyo's treatment of *him*:  conduct *not* made unlawful by Title VII.  Dr. McCarthy also stated in his deposition that he did not receive Dr. Gollas' 1 March written complaint and that, had he received it, he would have forwarded it to the nurse manager for investigation and contacted UTH legal services.

Second, Dr. Gollas contends the summary-judgment evidence reflects that, around 3 or 4 March 2007, he told Dr. Crandell about details of the 1 March incident.  According to Dr. Crandell's deposition, however, she:  was not aware that Dr. Gollas complained to Dr. McCarthy; and, stated that Dr. Reichman told her about a shouting match between Drs. Gollas and Arroyo, but that he did not tell her about the substance of that dispute or that Dr. Gollas had complained of sexual harassment.

Third, Dr. Gollas contends the summary-judgment evidence reflects that he complained to Dr. Colasurdo around 8 March 2007.  As stated in his declaration, Dr. Colasurdo has no recollection of Dr. Gollas' doing so.  Moreover,

from 5 to 9 March 2007, when, according to Dr. Gollas' deposition, he spoke with Dr. Colasurdo, Dr. Gollas was on vacation.

Dr. Gollas also stated in his deposition that he complained of sexual harassment to Dr. Reichman by providing Nurse Bennett a copy of his claimed 1 March written complaint to deliver to Dr. Reichman.  In Dr. Reichman's deposition, however, he stated that Dr. Gollas never complained to him.  Notably, Dr. Gollas cannot confirm the letter's delivery.

Finally, Dr. Reichman's letter to ACGME and his informing Dr. Crandell that an incident occurred are advanced to create a genuine dispute of material fact that Dr. Gollas opposed sexual harassment.  In his letter, Dr. Reichman was not conceding that Dr. Gollas complained of sexual harassment; he stated that Dr. Gollas' complaint was regarding an inappropriate comment made to the physician assistant—similar to what Dr. McCarthy stated in his deposition.  In his deposition, Dr. McCarthy stated that Dr. Gollas discussed inappropriate comments made by Dr. Arroyo, but that he ultimately thought Dr. Gollas was complaining about Dr. Arroyo's behavior towards Dr. Gollas, not sexual harassment.  Further, because Dr. Reichman stated in his deposition that Dr. Gollas never complained to him, he was not speaking from personal knowledge in his 6 August 2007 letter to ACGME (five months after termination), but was describing the incident as related to him by Dr. McCarthy.

Similarly, Dr. Reichman's informing Dr. Crandell about the incident is advanced to create a genuine dispute of material fact on protected activity.  Dr. Reichman admitted in his deposition having been told by Dr. McCarthy that "there was a situation" and relaying that information to Dr. Crandell around 1 or 2 March 2007; however, he also stated in his deposition that he did not know the exact nature of the incident, and told Dr. Crandell only that it happened, and that Dr. McCarthy was investigating it.

As noted, whether Dr. Gollas satisfied his burden to create a genuine dispute of material fact on protected activity is a close question.  In the light of

the conflicting summary-judgment evidence, we will assume that he met that burden.

## 2.

Even assuming Dr. Gollas engaged in protected activity, he still does not create a genuine dispute of material fact on whether he established a prima face case because he failed to create such a dispute on the third element:  a causal link between that activity and the adverse employment action.  To show such a dispute on causal link, Dr. Gollas relies, *inter alia*, on the following:  the close temporal proximity between his post-incident complaint and the adverse employment action; and the claimed insufficient reasons provided by UTH to support the adverse employment action, especially in the light of his third-year-residency appointment's having been granted on 1 February 2007.  For the reasons that follow, and in holding that Dr. Gollas failed to show a prima facie case of retaliation, we need not reach the close-temporal-proximity and insufficient-reasons issues.

As an initial matter, Dr. Gollas must create a genuine dispute on whether the final decisionmakers knew of his claimed sexual-harassment complaint. *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003).  As discussed *supra*, Dr. Gollas stated in his deposition that he complained to the final decisionmakers—Drs. Crandell and Colasurdo—about Dr. Arroyo's conduct.  In the alternative, if there is no such genuine dispute on whether those doctors were aware of the claimed protected activity, Dr. Gollas maintains the causal-link element was satisfied because Dr. Reichman had a retaliatory motive and influenced the adverse employment action by those two doctors.

Although the causal-link element for establishing a prima facie case is similar to the ultimate question of whether the protected activity was a "but for" cause of the adverse employment action, "the standards of proof applicable to these questions differ significantly", *Long*, 88 F.3d at 305 n.4:  the causal-link element is much less stringent than showing "but for" causation, *Medina*, 238

F.3d at 685.   Re-stated, plaintiff may satisfy the causal-link element but ultimately fail to do so for the ultimate question of "but for" causation. *Long*, 88 F.3d at 305 n.4 (citing *McMillan v. Rust Coll., Inc.*, 710 F.2d 1112, 1116-17 (5th Cir. 1983)).   Unlike "but for" causation, showing a causal link does *not* require showing the protected activity was the sole motivating factor for the adverse employment action. *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).

### a.

As noted, it must first be shown for summary-judgment purposes that the final decisionmakers "knew about [Dr. Gollas'] protected activity". *Manning*, 332 F.3d at 883.   "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) (citation omitted).

Dr. Gollas has failed to create a genuine dispute of material fact on whether the final decisionmakers knew of his protected activity.   *See, e.g.*, *Manning*, 332 F.3d at 883 n.6.   Dr. Gollas stated in his deposition that he reported Dr. Arroyo's conduct to Drs. McCarthy, Crandell, Colasurdo, and Reichman; but, as discussed *supra*, not one of them remembers his complaining about sexual harassment.   More importantly, even if Drs. McCarthy and Reichman received Dr. Gollas' claimed 1 March 2007 letter, neither were involved in the decision to terminate the third-year-residency appointment; thus, their knowledge of the protected activity cannot establish a causal link.

### b.

Dr. Gollas contends that, even if the final decisionmakers (Drs. Crandell and Colasurdo) were unaware of protected activity, the causal-link element was satisfied for summary-judgment purposes under a cat's-paw theory because they were influenced by Dr. Reichman.   Dr. Gollas contends Dr. Reichman knew of the protected activity and had a retaliatory motive.   Specifically, Dr. Gollas contends Dr. Reichman: prepared his February 2007 evaluation, which included

claimed fabricated comments; and  threatened Dr. Gollas during the first week of March because of his sexual-harassment complaint against Dr. Arroyo.

The term cat's paw is defined as "one used by another as a tool", MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 181 (10th ed. 2001); it was derived from "a fable conceived by Aesop . . . [where] a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing", *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1190 n.1 (2011), *rev'g Staub v. Proctor Hospital*, 560 F.3d 647 (7th Cir. 2009).  Under the cat's-paw theory, if employee demonstrates a co-worker with a retaliatory motive had influence over the ultimate decisionmakers, that co-worker's retaliatory motive may be imputed to the ultimate decisionmakers, thereby establishing a causal link between the protected activity and the adverse employment action. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004); *Gee*, 289 F.3d at 346; *see also Long*, 88 F.3d at 307 (finding sufficient evidence of causal link where ultimate decisionmaker influenced by co-workers with retaliatory motives).

In the Supreme Court's recent analysis of a cat's-paw claim in *Staub*, *see generally* 131 S. Ct. 1186, employee claimed he was unlawfully terminated because of his military obligations, in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4311(a), (c). *Id.* at 1189-91.  Conceding the ultimate decisionmaker was *not* motivated by hostility to his military obligations, employee maintained two of his supervisors (nondecisionmakers) were so motivated, and influenced the adverse employment action. *Id.* at 1190.  In granting defendant judgment as a matter of law, the Seventh Circuit held that a cat's-paw claim could succeed only where the nondecisionmaker exercised such singular influence over the decisionmaker that the termination decision was the product of blind reliance.  *Staub v. Proctor Hosp.*, 560 F.3d 647, 659 (7th Cir. 2009).  The Seventh Circuit found that the

decisionmaker was "not wholly dependent" on the advice of the nondecisionmakers. *Id.*

In reversing, the Supreme Court held: as long as the nondecisionmaker performs an act motivated by unlawful reasons that is intended to cause an adverse employment action, and the act is a proximate cause of the adverse employment action, employer is liable. *Staub*, 131 S. Ct. at 1194. Specifically, the Court ruled: the two nondecisionmakers' actions (the first, issuing employee a corrective-action directive; the second, informing the final decisionmaker of employee's noncompliance with that directive) were "motivated by hostility toward [employee's] military obligations"; the corrective-action directive was relied on in employee's termination decision; and both nondecisionmakers had the specific intent to cause that termination. *Id.*

In the light of the Court's holding in *Staub*, Dr. Gollas has failed, under a cat's-paw theory, to create a genuine dispute of material fact on the causal-link element. The summary-judgment record is devoid of evidence that Dr. Reichman performed an act motivated by retaliatory animus, or intended that act to cause Dr. Gollas' termination. Dr. Gollas' mere speculation that Dr. Reichman acted with a retaliatory motive in completing Dr. Gollas' February rotation evaluation is insufficient to show a causal link. *See, e.g.*, *Septimus v. Univ. of Hous.*, 399 F.3d 601, 611 (5th Cir. 2005).

Because the summary-judgment record reflects that Dr. Reichman was unaware of a sexual-harassment complaint, there is no genuine dispute of material fact on whether he harbored retaliatory animus. As discussed, Dr. Reichman stated in his deposition that he never received Dr. Gollas' claimed 1 March 2007 letter complaining of sexual harassment by Dr. Arroyo and was unaware that Dr. Gollas complained of such conduct. Moreover, Dr. Gollas' unsubstantiated statement in his 31 May 2007 letter to the EEOC that Dr. Reichman threatened him in the weeks following his complaint is insufficient to show retaliatory animus.

13

Even assuming, for summary-judgment purposes, that Dr. Reichman harbored retaliatory animus, there is no genuine dispute on whether he intended the February rotation evaluation to cause an adverse employment action. The February rotation evaluation was not typed in the computer until 5 March 2007 (the date the rotation was completed); but, it had been determined over a week earlier, at the 22 February meeting and *prior* to the 1 March incident involving Drs. Gollas and Arroyo, that Dr. Gollas failed his February rotation. Dr. Gollas maintains the comments in this evaluation were fabricated; however, other doctors agreed with Dr. Reichman's assessment. As provided in the summary-judgment record, Drs. Koerner and King, who attended the 22 February meeting, corroborated that Dr. Gollas failed his February rotation. Dr. Koerner also stated in her declaration that she told Dr. Gollas before the 1 March incident that he would be required to repeat that rotation.

## B.

Even assuming Dr. Gollas created a genuine dispute on whether he showed a prima facie case of retaliation, he fails: to create such a dispute on whether UTH failed to meet its resulting burden to produce legitimate, non-retaliatory reasons for terminating his third-year-residency appointment; and, on the burden shifting back to him, to create a genuine dispute on whether these reasons were pretext for unlawful retaliation. The district court held there was no genuine dispute of material fact that the termination of the appointment was based on unlawful reasons, implicitly finding no genuine dispute on pretext. *Gollas*, 2010 WL 1628996, at *2. As discussed, if UTH produces a legitimate, non-retaliatory reason for the adverse employment action, the focus shifts to the ultimate question of retaliation: whether Dr. Gollas produced sufficient evidence to create a genuine dispute of material fact that, but for his complaint against Dr. Arroyo, UTH would not have terminated his third-year-residency appointment. *See, e.g.*, *Strong*, 482 F.3d at 806.

As stated *supra*, to survive summary judgment, the more stringent "but for" causation standard requires Dr. Gollas to demonstrate "a conflict in substantial evidence on the ultimate issue of retaliation". *Medina*, 238 F.3d at 685 (citation and internal quotation marks omitted). Under this "but for" causation standard, "[e]ven if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct". *Long*, 88 F.3d at 305 n.4 (citing *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir. 1984)). (The mixed-motives method of proof does not apply here; Dr. Gollas' entire claim was based on UTH's explanations for the appointment termination being pretextual:  he claimed it was in retaliation for his complaint against Dr. Arroyo, and never acknowledged that the reasons for the termination were valid. *See, e.g.*, *Smith v. Xerox Corp.*, 602 F.3d 320, 339-40 (5th Cir. 2010).)

**1.**

Based on the summary-judgment record, Dr. Gollas failed to create a genuine dispute on whether UTH produced legitimate, non-retaliatory reasons for terminating his third-year-residency appointment. As discussed, UTH's burden at this stage is one of *production*, *not persuasion*. *Patrick*, 394 F.3d at 315. "[A]n employer must articulate a nondiscriminatory reason *with 'sufficient clarity'* to afford the employee a realistic opportunity to show that the reason is pretextual". *Id.* at 317 (emphasis in original) (citation omitted). Where there is close timing between the protected activity and adverse employment action, employer must offer "a legitimate, [non-retaliatory] reason that explains both the adverse action and the timing". *Shackelford*, 190 F.3d at 408 (emphasis omitted) (citation and internal quotation marks omitted).

Again, Dr. Colasurdo was the pediatrics department chair. He stated in his declaration that he agreed with the termination-of-appointment decision because of Dr. Gollas' "marginal performance" during his second year of

residency, "his failure of an emergency medicine rotation in February 2007, [] the fact that his behavior was not appropriate in several instances, including a shouting match with an attending physician [Dr. Arroyo], and that he had been the subject of complaints from nurses regarding his inappropriate behavior and potentially harassing conduct". As discussed, Dr. Crandell was the pediatrics program director. She stated in her deposition her concerns about Dr. Gollas: "[h]is performance in the PICU; his performance in [] emergency medicine; his treatment of his fellow residents"; and allegations that he made inappropriate comments to a medical student and a resident.

Moreover, Dr. Gollas' "poor performance and improper conduct were not unsubstantiated when [his third-year-residency appointment] was [terminated]". *Strong*, 482 F.3d at 808. Some of the attending physicians who evaluated Dr. Gollas, including Drs. Strobel, Feldman, and Reichman, expressed concern regarding his performance. For example, in Dr. Gollas' November 2006 rotation evaluation, Dr. Strobel stated in the comments section that "[i]nformation given [by Dr. Gollas] on rounds was not reliable which delayed patient care. Relationship with team members was strained". Further, in Dr. Gollas' January 2007 rotation evaluation, Dr. Feldman stated in the comments section that Dr. Gollas had "difficulty accepting/applying received feedback and in accepting responsibility as an active participant in his learning". In Dr. Gollas' failing February rotation evaluation, Dr. Reichman stated that "Dr. Gollas' performance is clearly below what is expected for a Pediatric resident at his level of training".

Further, Dr. Koerner, who worked with Dr. Gollas during his February rotation, stated in her declaration that it was her "independent recollection that Dr. Gollas' performance was not satisfactory and was not sufficient to achieve a passing grade for the February rotation". In her 22 September 2009 statement, responding to three questions she was asked by UTH about her interaction with Dr. Gollas and attached to UTH's summary-judgment motion, Dr. Koerner stated that Dr. Gollas was missing for almost an hour during the

February rotation, and his knowledge base was limited for someone with his level of training.

Dr. Oakes similarly noted in her September 2009 statement, responding to those same three questions posed by UTH and attached to UTH's summary-judgment motion, that: "Dr. Gollas' knowledge base for patient care was severely below expectations"; and he "consistently underassessed, misdiagnosed, or dismissed important history on physical exam findings, yet thought he was doing a magnificent job". She also noted in that statement that "families, nurses, and female medical students complained about Dr. Gollas' interpersonal skills, his overly familiar and too casual mannerisms, and his poor follow-through with patient care".

UTH also produced a legitimate, non-retaliatory reason for the close timing between the protected activity and adverse employment action: Dr. Gollas' failing February rotation and his continuing poor performance during his March rotation.

**2.**

UTH's having satisfied its burden of *production*, the burden shifts back to Dr. Gollas to demonstrate that he created a genuine dispute that, but for his complaint against Dr. Arroyo, termination of his third-year-residency appointment would not have occurred. *Strong*, 482 F.3d at 806. This is done by Dr. Gollas' creating a genuine dispute on whether UTH's reasons for his termination were pretext for unlawful retaliation. *Medina*, 238 F.3d at 685. "Simply disputing the underlying facts of an employer's [adverse employment] decision is not sufficient to create an issue of pretext." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).

In contending he created a genuine dispute on whether UTH's reasons are pretextual, Dr. Gollas relies on the following summary-judgment evidence: UTH based the appointment termination on his failed February rotation, but later relied on "made for litigation" reasons including unsubstantiated sexual

harassment assertions, complaints about getting along with others, and 2006 evaluations, despite that UTH had already considered and dismissed these reasons when it granted Dr. Gollas' third-year-residency appointment; and, Dr. Gollas had been permitted to repeat his failed February rotation, but UTH abruptly terminated the appointment shortly after he made a sexual-harassment complaint against Dr. Arroyo. Viewing the summary-judgment evidence in the light most favorable to Dr. Gollas, he has failed to create a genuine dispute of material fact on whether the appointment would not have been terminated but for his complaint against Dr. Arroyo. *See, e.g.*, *Sherrod*, 132 F.3d at 1123.

Dr. Gollas' first assertion, that UTH's reasons were concocted for the purpose of litigation, does not create a genuine dispute on pretext. As stated *supra*, and reflected in the summary-judgment record, Drs. Crandell and Colasurdo never stated that the termination was due to one failing rotation. To the contrary, they stated in their depositions and in his appointment-termination letter that it was the result of his poor performance history, poor relationship with other residents, and inappropriate behavior. The summary-judgment record reflects that Dr. Gollas fails to create a genuine dispute on whether: Drs. Crandell and Colasurdo failed carefully to consider Dr. Gollas' performance history, as well as his conduct during February, in reaching their decision; and whether his performance and concerns about his professionalism during February were a catalyst for Dr. Crandell's decision to reconsider Dr. Gollas' third-year-residency appointment and review his record as a whole.

Dr. Gollas also contends UTH's reasons were pretextual because he had been permitted to repeat his February rotation, but was abruptly terminated after he made his claimed complaint against Dr. Arroyo. Again, this assertion is insufficient to create a genuine dispute on pretext. As stated in her declaration, Dr. Koerner spoke with Dr. Gollas regarding his failed rotation sometime between 22 and 27 February 2007, and told him that he would be

required to repeat the failed rotation; however, there is no summary-judgment evidence that Dr. Koerner *permitted* him to do so.

Finally, Dr. Gollas' assertions in support of the causal-link element for a prima facie case, discussed *supra*, are similarly insufficient to create a genuine dispute of material fact on "but for" causation. As discussed, UTH provided summary-judgment evidence of numerous reasons in support of the appointment termination, and the close proximity between it and the protected activity, without more, is insufficient to create a genuine dispute on pretext. *See, e.g.*, *Shackelford*, 190 F.3d at 409 (finding close proximity between protected activity and adverse employment action, when coupled with other significant pretext evidence, sufficient to survive summary judgment).

Dr. Gollas' unsubstantiated allegations and his subjective belief of retaliation are insufficient to survive summary judgment. *See Strong*, 482 F.3d at 808-09 (ruling that, because employer stated legitimate reasons for firing employee, and employee did not produce sufficient evidence that those reasons were pretextual, retaliation claim failed). Because UTH has produced legitimate, non-retaliatory reasons for the appointment termination, and Dr. Gollas failed to provide sufficient summary-judgment evidence that those reasons were pretext for unlawful retaliation, there is no genuine dispute of material fact that the third-year-residency appointment would not have been terminated but for his claimed complaint against Dr. Arroyo. *See Roberson*, 373 F.3d at 656 (holding that, without more than timing allegations, and based on employer's legitimate, nondiscriminatory reason, summary judgment was proper).

### III.

For the foregoing reasons, the judgment is AFFIRMED.