

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-17-00003-CV

WANDA ESKER                                                        APPELLANT

V.

CITY OF DENTON, TEXAS                                              APPELLEE

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 14-00942-158

----------

## MEMORANDUM OPINION[1]

----------

Appellant Wanda Esker appeals from the trial court's order granting the plea to the jurisdiction and motion for summary judgment filed by appellee City of Denton, Texas (the City). Esker argues that because she raised a genuine issue of material fact as to whether the City terminated her employment in retaliation

---

[1]*See* Tex. R. App. P. 47.4.

for her reports of sexual harassment by a co-worker, the City was entitled to neither immunity nor summary judgment. We conclude that Esker failed to raise a disputed material fact regarding the City's plea and, accordingly, affirm the trial court's order granting the plea and dismissing Esker's claims.

## I. BACKGROUND

### A. ESKER'S EMPLOYMENT AND TERMINATION

Esker was employed by the City as a Senior Duty Officer in the City's police department (the department). Esker's duty station was the front desk in the department's lobby, and she supervised five other duty officers. Her job involved answering nonemergency calls, assisting people who came to the department, and ensuring that the front desk was staffed at all times.

In May 2006, Esker was counseled for reporting to work late and in November 2006, she was placed on a performance-improvement plan for "continual tardiness." Also in 2006, Esker reported to the City's human-resources department (HR) that a supervisor had "gotten overly angry at her at work." Almost immediately after she made that report, the Chief of Police at that time, Charles Wiley, allegedly berated Esker for making the report and told her that she "would be watched." But in May 2011, Esker's annual "Performance Feedback" noted that she displayed "leading performance," the highest level of expectation, in her work habits: "Wanda demonstrates attendance and punctuality to work assignments (e.g., on time to work and meetings). She

2

regularly attends work and taking off only as needed to accommodate childcare scheduling."

In mid-December 2011, Esker again approached HR and reported to Kelly Butler that she was "having problems with a coworker," who she alleged was sending her inappropriate text messages and had tried to kiss her. Because of her 2006 experience and "concern over potential repercussions from the Police Department," Esker refused to give any details and, in fact, did not disclose the name of the co-worker who sent the messages. Esker merely wanted to "know what [her] rights were." As such, Butler told her that he needed more information in order to help.

Meanwhile, on December 12, 2011, a police officer saw Esker "taking a toy from a toy drive donation bin and stashing it behind her duty desk." This allegation caused Lieutenant David Hildebrand, Esker's direct supervisor, to begin monitoring the video surveillance of Esker's desk. Because of interviews Hildebrand conducted "during this time period," Esker was aware of the investigation into her conduct. Hildebrand's investigation ultimately revealed that "Esker was leaving her work area without supervisory clearance and without proper documentation of her time records." In a two week period—December 10 to December 23—"Esker claimed [on her time sheets] 15½ hours worked, when she was not present." The investigation also showed that if Esker had accurately reported her time during that period, she would have accrued insufficient time in

order to take her scheduled vacation, which occurred over the Christmas holidays.[2]

On January 10, 2012, Hildebrand questioned Esker about the time discrepancies between her time sheets and the video. Esker told Hildebrand that it was "an honest mistake." The next day—January 11—Hildebrand informed Esker "that there was an investigation and not to talk to anyone about what was discussed at [their prior] meeting." Esker believed that Hildebrand's questioning "was in retaliation for [her] going to HR [in December 2011]." On January 13 at 2:16 p.m., Esker informed Hildebrand that she had "stayed over 2 days this week" and, therefore, would be leaving at 4:00 p.m. that day. Hildebrand responded at 2:58 p.m., asking Esker to meet with him to discuss her schedule and "what is expected regarding that schedule."

That same day—January 13—Esker again reported the alleged sexual harassment to Butler and another HR employee, Carri Byrd. Esker was "reluctant" to give details and did not reveal the name of her harasser or show them the texts, stating that she would "think about" giving more information and then "get back with [Byrd]." Esker also mentioned to Byrd that she had "concerns with the people in the department, like her supervisors and stuff, how they were treating her." Byrd then reported to the HR director that Esker had "mentioned" that she had been harassed but that she had failed to "give . . . any specific

---

[2]As a result of his investigation, Hildebrand ultimately proposed that Esker's employment be terminated.

4

information." At the director's instruction to "follow-up" with Esker, Byrd called Esker at work to get more information, but Esker told her that she was not "comfortable talking on a recorded line within earshot of my co-workers" and asked Byrd to call back later.[3] No follow-up occurred; therefore, Byrd sent Esker a certified letter on February 6, stating that more information was needed to proceed with an investigation and that the matter would be "closed" if Esker did not give more details by February 13.[4] In the letter Byrd reminded Esker that she had "not share[d] any specific information . . . and [was] uncertain about bringing a complaint forward." Esker did not respond to the letter, and Byrd did not report Esker's unspecific allegations to the department.

On January 26, Hildebrand gave Esker a "memo," which Esker signed, that stated she could not adjust her schedule "in any way" from her scheduled work hours. After Esker took two days off on February 13 and 14 to deal with an "emergency involving a pet at [her] property," Hildebrand verbally warned her on February 15 that she had not followed the correct procedure for requesting the time off. Between February 16 and 17, Hildebrand and Esker had an email exchange in which Hildebrand questioned her recent schedule changes and Esker responded that she "want[ed] the same treatment . . . as the other Duty Officers."

---

[3]Byrd stated that Esker confirmed she would "come down and talk . . . in a few days," but that Esker never did.

[4]Esker denied receiving this letter.

5

On February 20, Captain Scott Fletcher[5] sent a memorandum to Esker, notifying her that the department had ended its investigation into her conduct on December 12 through December 23 and that the allegations regarding "Processing Property and Evidence" and "Departmental Reports" had been sustained. The memorandum informed her that the current Chief of Police, Lee Howell, would make the final decision regarding the appropriate disciplinary action and that she had the option to meet with him. In a separate memorandum dated that same day, Fletcher notified Esker that she had been placed on administrative leave with pay. Esker signed this memorandum, acknowledging that she had received it on February 20.

On February 22, Esker was formally notified that Howell had "decided that termination was in order for this offense[, i.e., falsification of time records]." The notice of the termination decision, which Esker signed acknowledging receipt, had a section allowing her to "Comment[]" or "Rebut[]" the allegations. Esker did not add any comments. As mentioned as an option in Fletcher's February 20 memorandum, Esker then met with Howell "to discuss her termination, as well as a number of other operational complaints." She admittedly did not mention her sexual-harassment allegations to Howell. Esker administratively appealed the

---

[5]Apparently, Fletcher was also one of Esker's supervisors.

6

decision as allowed by the City's policies to no avail.[6]  In her administrative appeal, Esker did not mention her sexual-harassment allegations.

## B. CHARGE OF DISCRIMINATION AND LAWSUIT

On June 21, 2012—four months after she was terminated and almost three months after her administrative appeal concluded—Esker submitted a sworn charge of discrimination to the Equal Employment Opportunity Commission (EEOC), indicating on the form that her termination was discriminatory because it was retaliatory and because it was based on her sex.  However, the substance of her charge focused on the retaliation allegation:

> I complained to HR in mid-December 2011 about various sexually inappropriate comments and touches made by a Public Information Officer co-worker.  I complained again on Jan. 13.  I was put on administrative leave on Feb. 20, 2012, and then fired two days later.  The Denton Police Department has violated my employment rights, both the Texas Labor Code, and Title VII of the Civil Rights Act of 1964.

*See* Tex. Lab. Code Ann. §§ 21.051, 21.055, 21.201 (West 2015); *accord* 42 U.S.C.A. § 2000e-3(a) (West 2012).  During the EEOC's ensuing investigation, Esker revealed the name of her alleged harasser, admittedly for the first time, and the substance of his texts.  *See* Tex. Lab. Code Ann. § 21.204 (West 2015).  The City responded to the charge and urged the EEOC to dismiss

---

[6]Both the City and Esker alternately argue that Esker's termination was based on the toy drive and the time discrepancies or on the time discrepancies alone.  Although Howell averred in his affidavit that the toy drive was the catalyst for Hildebrand's investigation, Howell's decision to terminate Esker's employment was based solely on the time discrepancies revealed by the investigation.

it. The EEOC notified Esker on December 16, 2013, that it was "terminating its processing of this charge" and that she had the right to bring a private civil suit. *See id.* §§ 21.208, 21.252 (West 2015).

On February 12, 2014, Esker filed a petition in state court, arguing that her termination had been discriminatory and violated the Texas Commission on Human Rights Act (the TCHRA) because it had been based on "her complaints of sexual harassment in the workplace."[7] In the petition, Esker again identified her alleged harasser by name. The City filed a plea to the jurisdiction and alternative motion for summary judgment, arguing that because Esker had failed to allege a prima facie charge of discrimination within the scope of the TCHRA, it was immune from suit or, alternatively, entitled to judgment as a matter of law. The City's plea and motion were based mainly on its contentions that the decisionmakers involved in her termination never learned of Esker's sexual-harassment complaints before she filed her charge of discrimination with the EEOC.

On November 18, 2016, the trial court granted the City's plea to the jurisdiction, granted its motion for summary judgment, and dismissed Esker's suit. Esker now appeals and argues in two issues that the trial court erred by granting the plea and the summary-judgment motion because the City's

---

[7]Esker did not allege that her termination was discriminatory because it had been based on her sex as she had indicated in her charge of discrimination.

8

governmental immunity was waived by the TCHRA and because she raised a genuine issue of material fact regarding but-for causation.

## II. STANDARD OF REVIEW

Subject-matter jurisdiction is properly raised in a plea to the jurisdiction, and we review a trial court's determination of the issue de novo as a question of law. *See Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). A plea to the jurisdiction may challenge whether the plaintiff's pleadings affirmatively allege facts showing the court's jurisdiction and may also challenge the existence of jurisdictional facts to support the pleadings. *See Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012).

Where the plea challenges the existence of jurisdictional facts, the trial court may consider the evidence submitted by the parties to resolve the issue "even if that evidence 'implicates both the subject-matter jurisdiction of the court and the merits of the case.'" *Id.* (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)). As such, the trial court's review mirrors that of a traditional summary judgment:

> Initially, the defendant carries the burden to meet the summary judgment proof standard for its assertion that the trial court lacks jurisdiction. If it does, the plaintiff is then required to show that a disputed material fact exists regarding the jurisdictional issue. If a fact issue exists, the trial court should deny the plea. But if the relevant evidence is undisputed or the plaintiff fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea as a matter of law.

*Id.* (footnotes omitted).

9

A suit against a governmental employer, such as the City, impacts governmental immunity, which may be raised in a plea to the jurisdiction. *See id.* at 635–36. Unless the State has consented to suit, governmental immunity will deprive the trial court of jurisdiction over the suit. *See id.* at 636.

The TCHRA waives governmental immunity but only in those instances where "the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Id.* To do so, the plaintiff first must make a prima facie showing of each element of her retaliation claim under the TCHRA: (1) participation in a protected activity, (2) an adverse employment action, and (3) a causal link between the activity and the adverse action. *See Cabral v. Brennan*, 853 F.3d 763, 766–67 (5th Cir. 2017);[8] *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015). Only if the plaintiff does so must the defendant then present evidence negating one of those basic facts.[9] *See Garcia*, 372 S.W.3d at 637.

### III. APPLICATION

Esker alleged that she "complained of sexual harassment in the workplace," leading to her termination. In its plea and motion, the City

---

[8]Because the TCHRA was enacted to coordinate Texas law with federal anti-discrimination law, we may look to analogous federal statutes and cases interpreting those statutes in our analysis. *See In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308 (Tex. 2010) (orig. proceeding).

[9]If the defendant does so, the plaintiff may avoid the defendant's plea by submitting some evidence, which we take as true, to raise a fact issue as to the negated element. *See Garcia*, 372 S.W.3d at 637; *Miranda*, 133 S.W.3d at 228.

challenged whether Esker engaged in a protected activity and whether there was a causal link from the alleged discrimination to her termination.[10]

Regarding the absence of a causal link, the City asserted that Esker failed to show that the decisionmakers involved in her termination knew about her sexual-harassment allegations or that her allegations to HR were a motivating factor in the decision to terminate her employment. The City pointed to Esker's deposition admissions that before she was terminated, she made her sexual-harassment allegation only to Butler and Byrd in HR—who undisputedly were not decisionmakers in Esker's termination—and that she never mentioned the allegation during Hildebrand's investigation or during her administrative appeal of her termination.

Esker responded that she raised a fact issue regarding prima-facie causation because her termination occurred so close in time to her conversations with Butler and Byrd, she had received a good performance evaluation less than a year before she was terminated, and other employees had incorrectly reported

---

[10]On appeal, the City states that it will not concede that Esker's termination was an adverse employment action; however, the City then contends that it "does not actively dispute that termination is serious enough to be characterized as an adverse employment action, assuming that a causal connection can be shown to protected activity." We read this assertion to be a recognition that Esker's termination, standing alone, was an adverse employment action for purposes of assaying her prima facie case. Indeed, there is no authority to support an argument that a termination is not an adverse employment action under the TCHRA. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 575 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Accordingly, we will not further address this element of retaliation.

their time but had not been fired. As evidence, she attached her 2011 performance evaluation and her unsworn declaration in which she named other noncompliant, yet not similarly disciplined, employees and referred to her 2006 experience with reporting her supervisor to HR and the prior chief's threats. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a) (West Supp. 2016) (governing declarations). On appeal, Esker relies on the same circumstantial evidence to argue that she raised a fact issue on causation, preventing judgment in the City's favor.

Even though Esker relies on circumstantial evidence of retaliation, her prima facie case of causation does not require her to prove that her protected activity was the sole factor behind her termination or that she would not have been terminated but for her protected activity. *See Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002); *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996). But Esker still must produce some evidence of a causal link, i.e., the employment decision and protected activity were not completely unrelated. *See Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003); *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001); *Keeley v. Cisco Sys.*, No. Civ.A.301CV1504D, 2003 WL 21919771, at *4 (N.D. Tex. Aug. 8, 2003). To determine whether an adverse employment action was taken as a result of retaliation at the prima facie stage, we focus on the final decisionmaker. *See Gee*, 289 F.3d at 346; *Long*, 88 F.3d at 306–07. The plaintiff must show that the final decisionmaker was aware of the plaintiff's protected activity: "If an employer is unaware of an

12

employee's protected activity at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999); *see Ackel*, 339 F.3d at 385–86.

Here, there is absolutely no evidence that Howell, the final decisionmaker, was aware of Esker's complaints to HR at the time the adverse employment decision was made. Esker conceded as much in her deposition testimony and her declaration. And there is no evidence, nor does Esker allege, that Howell acted as a mere cat's paw for those acting with retaliatory intent. *See Long*, 88 F.3d at 307. Howell stated in his affidavit that he knew nothing of Esker's complaints to HR:

> Upon completion of the investigation . . . , Esker's supervisor proposed a termination, which made its way up the chain of command. As the Chief, the final decision was mine, and I decided that termination was in order for this offense [i.e., improper documentation of time records]. I was the final decision maker on the termination, and Esker was terminated on February 22, 2012.
>
> . . . .
>
> At the time of my final decision to terminate Esker, I had no knowledge of any prior meeting that Esker had with HR regarding any expression of concern over sexual harassment in the workplace, nor did I have any actual knowledge of such a concern. HR did not approach me with any such information prior to my decision to terminate, and I did not learn of any expression of concern until several months later, after the EEOC mailed its notification to HR in December 2012.

It was undisputed that although Esker mentioned sexual harassment to HR, she refused to give specifics that would allow HR to begin an investigation. HR in

13

turn never reported the allegations to anyone in Esker's supervisory chain of command. Esker's subjective belief that her termination was based on her unspecific complaints to HR, which no decisionmaker was aware of, is insufficient to meet her prima facie burden on causation. *See Gollas v. Univ. of Tex. Health Sci. Ctr. at Hous.*, 425 F. App'x 318, 321 (5th Cir. 2011); *Collins-Pearcy v. Mediterranean Shipping Co. (USA)*, 698 F. Supp. 2d 730, 763–64 (S.D. Tex. 2010). As such, there was no disputed issue of material fact regarding causation, an element of Esker's prima facie case of retaliation and, thus, a jurisdictional issue. *See Gollas*, 425 F. App'x at 324–26; *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003); *Chaney*, 179 F.3d at 168; *Cole v. City of Port Arthur*, No. 1:13-CV-176, 2014 WL 3513366, at *14 (E.D. Tex. July 16, 2014); *Garcia*, 372 S.W.3d at 635–36.

Esker argues in her reply brief that her retaliation claim does not "stand or fall on evidence of the knowledge of the final decision-maker" and asserts that her prima facie case of causation may be "established via multiple circumstances, not merely that one." But the case she cites in support of this statement—*Crutcher v. Dallas Independent School District*, 410 S.W.3d 487 (Tex. App.—Dallas 2013, no pet.)—does not so hold. Indeed, the court in *Crutcher* recognized that Crutcher relied on circumstantial evidence of a causal link to establish a prima facie case of unlawful retaliation; but the court concluded that her circumstantial evidence could not overcome the fact that no decisionmaker involved in the adverse employment decision had been aware of

14

Crutcher's protected activity. *See id.* at 493–94, 496–97. Therefore, the court affirmed the trial court's summary judgment because Crutcher failed to show a prima facie case regarding causation. *See id.* at 497.[11]

## IV. CONCLUSION

Because Esker failed to make a prima facie showing of each element of her retaliation claim, the TCHRA did not waive the City's governmental immunity. *See Garcia*, 372 S.W.3d at 635–36. Accordingly, the trial court did not err by granting the City's plea to the jurisdiction, and we overrule Esker's first issue. We need not address her second issue directed to the trial court's alternative grant of summary judgment. *See* Tex. R. App. P. 47.1. We affirm the trial court's order. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DELIVERED: October 26, 2017

---

[11]As did the court in *Crutcher*, we note that even if Esker had established a prima facie case of retaliation, the City met its burden to provide substantial evidence of a legitimate, nondiscriminatory reason for its employment decision— the time-reporting discrepancies—and Esker did not raise a fact issue on pretext. *See Crutcher*, 410 S.W.3d at 497–98 ("The issue at the pretext stage is not whether the employer made an erroneous decision; it is whether the decision, even if incorrect, was the real reason for the employment determination.").